2005 SD 27

**DAKOTA SYSTEMS, INC., a South Dakota corporation, Missouri Valley Cellular, Inc., a South Dakota corporation, Eastern South Dakota Cellular, Inc., a South Dakota corporation, Sanborn Cellular, Inc., a South Dakota corporation, Verizon Wireless (VAW) LLC, a Delaware limited liability company, and Cellular Inc. Network Corporation, a Colorado corporation, Plaintiffs and Appellants,**

v.

**Gary VIKEN, Secretary of the South Dakota Department of Revenue and Regulation, Defendant and Appellee.**

No. 23189.

Supreme Court of South Dakota.

Argued on Jan. 11, 2005.

Decided Feb. 23, 2005.

Robert L. Ernst, Verizon Wireless, Bedminster, New Jersey, Dennis Duncan of Frieberg, Zimmer, Duncan & Nelson, LLP, Parker, South Dakota, Kimball R. Anderson, David E. Koropp of Winston & Strawn, LLP, Chicago, Illinois, Attorneys for plaintiffs and appellants.

Lawrence E. Long, Attorney General, David D. Wiest, Assistant Attorney General, Pierre, South Dakota, Attorneys for defendant and appellee.

MEIERHENRY, Justice.

[¶ 1.] This is an appeal from the trial court's grant of summary judgment in favor of defendant, Gary Viken, Secretary of the South Dakota Department of Revenue and Regulation (Viken). Plaintiffs' complaint requested a refund for taxes wrongfully collected and also sought a declaratory judgment that SDCL Chapter 10–33A violates state and federal law.

## FACTS

[¶ 2.] In the 2003 Legislative Session, the South Dakota Legislature passed House Bill No. 1104, entitled, "An Act to impose an excise tax on the gross receipts of personal communications system, wireless, and cellular telecommunications companies."[1] 2003 SD Laws ch 58. House Bill No. 1104 is codified at SDCL Chapter 10–33A, and became effective on July 1, 2003. It contains a total of twenty sections pertaining to the "tax of four percent upon the gross receipts of telecommunications services." SDCL 10–33A–4. It is the nature and effect of these various sections that is at issue in this case.

[¶ 3.] Plaintiffs (Verizon) provide commercial mobile radio service (CMRS)[2] in South Dakota under the trade-name "Verizon Wireless." Verizon paid the taxes owed under SDCL Chapter 10–33A "under protest" pursuant to SDCL 10–27–2. Verizon then challenged the tax regime of SDCL Chapter 10–33A in an eight-count complaint filed September 17, 2003.[3] In Count I, Verizon alleged that the licensing and other requirements imposed by SDCL Chapter 10–33A regulate market entry in express violation of 47 USC § 332(c)(3)(A) of the Communications Act of 1934.[4] In Count II, Verizon alleged that SDCL Chapter 10–33A prohibits or may have the effect of prohibiting the provision of CMRS in violation of 47 USC § 253 of the Telecommunications Act of 1996.[5] In Count III, Verizon contended that SDCL

1. The Governor's line item veto striking certain portions of the bill was over-ridden by the legislature.

2. The FCC has chosen to identify wireless telecommunications service as "commercial mobile radio service." *See* 47 CFR § 20.3, 47 USC § 332(d)(1).

3. Counts V through VII of the original complaint are not at issue on appeal.

4. 47 USC § 332(c)(3)(A) states in relevant part: "no State or local government shall have any authority to regulate *the entry of* or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." (Emphasis added).

5. 47 USC § 253 states in relevant part: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

Chapter 10–33A was preempted under general principles of field preemption.

[¶ 4.] In Count IV, Verizon alleged that House Bill No. 1104, which is codified at SDCL Chapter 10–33A, violated the single subject rule found in Article III, § 21 of the South Dakota Constitution. According to the averments in Verizon's complaint, the subject matter of the act is not single because it includes both the imposition of a regulatory regime and the creation of a tax scheme. In addition, it contains provisions unrelated to the gross receipts tax disclosed by the title, including an appropriation provision.

[¶ 5.] In Count VIII, Verizon sought a declaratory judgment seeking to have the telecommunications gross receipt tax declared "void, unconstitutional, and without force of law...."

[¶ 6.] Viken filed a Motion for Summary Judgment, and after a hearing the circuit court ruled in favor of Viken on all issues. The court determined that the tax statutes were not preempted and did not otherwise violate federal law nor did they violate the single subject rule of our state Constitution. The trial court also determined that the declaratory judgment action was not permitted because of sovereign immunity. Verizon appeals.

## STANDARD OF REVIEW

[¶ 7.] The issues in this case are questions of law and are reviewed de novo. *See Boomsma v. Dakota, Minnesota, & Eastern Railroad Corp.*, 2002 SD 106, ¶ 13, 651 N.W.2d 238, 242 (stating that the preemptive force of federal statutes is a question of law) (overruled on other grounds); *Cleveland v. BDL Enterprises, Inc.*, 2003 SD 54, ¶ 12, 663 N.W.2d 212, 217 (stating that whether a statute is constitu-

tional is reviewed de novo); *State v. Burgers*, 1999 SD 140, ¶ 8, 602 N.W.2d 277, 279 (stating that whether a court has jurisdiction to entertain an action is a question of law reviewed de novo).

## ISSUES

I. Whether the trial court erred in its determination that seeking declaratory relief against a state official sued in his official capacity violates principles of sovereign immunity.

II. Whether the trial court erred in its determination that House Bill No. 1104, which is codified at SDCL Chapter 10–33A, did not violate the single subject rule found in Article III, § 21 of the South Dakota Constitution.

III. Whether the trial court erred in its determination that SDCL Chapter 10–33A was not preempted by or in violation of federal law.

## DECISION

*Declaratory Relief*

[¶ 8.] The first issue is whether the trial court incorrectly determined that the doctrine of sovereign immunity prohibits Verizon from bringing a declaratory judgment action against the State. Verizon sought a declaratory judgment holding SDCL Chapter 10–33A unconstitutional and void. The declaratory judgment action did not seek a refund of taxes. Viken claims that the declaratory judgment action is impermissible under the principles of sovereign immunity. Viken cites to *Pennington County v. State ex rel. Unified Judicial System* to support his claim. 2002 SD 31, 641 N.W.2d 127.[6] That case,

6. Viken relies on the following language from the case:

The State is immune from suit unless it consents. The legislature may designate

however, is distinguishable. Pennington County sued the State directly, claiming that the Unified Judicial System owed rent for portions of the Pennington County Courthouse. The County sought a declaratory ruling on whether the State had to pay for the Courthouse space. We concluded that sovereign immunity barred the action because the suit was directly against the State and involved an action for which the State has not consented to be sued.

[¶ 9.] Conversely, we have stated that actions against officers of the state who "violate and invade the personal and property rights of the plaintiffs under color or authority unconstitutional and void, are not suits against the state." *White Eagle Oil & Refining Co. v. Gunderson,* 48 S.D. 608, 617, 205 N.W. 614, 617 (1925). Reaching a similar conclusion, the Nebraska Supreme Court recently stated: "We have held that a declaratory judgment action attacking the constitutionality of a statute or seeking relief from an invalid act or an abuse of authority by an officer or agent is not a suit against the state and is therefore not prohibited by principles governing sovereign immunity." *Northwall v. Dept. of Revenue,* 263 Neb. 1, 637 N.W.2d 890, 896 (2002) (citations omitted); *see also Miller v. Egan,* 265 Conn. 301, 828 A.2d 549, 560 (2003) ("Sovereign immunity does not bar suits against state officials acting in excess of their statutory authority or pursuant to an unconstitutional statute . . . .") (citation and quotations omitted); *Cf. Tucker v. Hinds County,* 558 So.2d 869, 872–73 (Miss.1990) ("to allow the sovereign immunity defense to block suits based on other provisions of the Mississippi Constitution

would render them . . . meaningless."). In addition, a review of our caselaw shows frequent challenges to the constitutionality of a statute by way of declaratory judgments. *See Vilhauer v. Horsemens' Sports, Inc.,* 1999 SD 93, 598 N.W.2d 525; *Boever v. South Dakota Bd. of Accountancy,* 1997 SD 34, 561 N.W.2d 309; *South Dakota Physician's Health Group v. State By and Through Dept. of Health,* 447 N.W.2d 511 (S.D.1989); *Wyatt v. Kundert,* 375 N.W.2d 186 (S.D.1985). Since a challenge to the constitutionality of a statute, without more, is not a suit against the state, the declaratory judgment action does not violate the principles of sovereign immunity.

[¶ 10.] Additionally, Viken asserts that because an adequate remedy is available via the tax refund statute located at SDCL 10–27–2, a declaratory judgment action cannot be maintained. In *Arneson v. Baker,* 76 S.D. 262, 264–66, 77 N.W.2d 325, 326–27 (1956), this Court held that declaratory actions to determine the illegality of a tax are permissible. We also addressed whether a tax refund statute precluded seeking a declaratory judgment on the legality of a tax, and we found it did not, stating: "Reason would seem to support adoption of this construction of the statute, permitting speedy determination of such questions as are here involved without any interruption of the collection processes, and in a manner which would permit the joinder in interest of many plaintiffs who might otherwise, however much aggrieved, be individually unable to

---

"in what manner and in what courts suits may be brought against the state." SD Const art III, § 27. The State may also waive sovereign immunity by legislative enactment identifying the conditions under which lawsuits of a specified type would be permitted. The State did not consent to be

sued in this case. Therefore, the trial court did not have jurisdiction to enter declaratory relief in favor of the county.
*Pennington County v. State ex rel. Unified Judicial System,* 2002 SD 31, ¶ 14, 641 N.W.2d 127, 131 (internal citations and quotations omitted).

secure review of such questions."[7] *Id.* at 266, 77 N.W.2d 325. In our more recent decision in *Agar School District No. 58–1 v. McGee,* we distinguished *Arneson* by stating, "[t]he issue [in *Arneson* ] was limited to the legality of the tax and not the question of refunds." 1997 SD 31, ¶ 16, 561 N.W.2d 318, 323. In the case before us, the declaratory judgment does not seek a refund, but is limited to the legality of the tax. Such an action is permissible under our caselaw and the trial court had jurisdiction to rule on the action. A declaratory judgment action is allowed under these circumstances.

*Single Subject Rule*

[¶ 11.] The second issue raised by Verizon is whether the trial court erred in its determination that House Bill No. 1104, codified at SDCL Chapter 10–33A, did not violate the single subject rule required by Article III, § 21 of the South Dakota Constitution. Article III, § 21 of the South Dakota Constitution states: "No law shall embrace more than one subject, which shall be expressed in its title." In *Simpson v. Tobin,* we set forth the principles by which we apply this constitutional provision, as follows:

> We just recently enunciated the general legal principles involved in attacks on constitutionality of statutes as it concerns the mandate expressed in Article III, § 21. In *Independent Community Bankers[Ass'n of South Dakota, Inc. v. State],* *supra*[346 N.W.2d 737 (SD 1984)] we said that every legislative act is accorded a presumption in favor of its constitutionality and that this presumption is overcome only by proof beyond a reasonable doubt that it violates fundamental constitutional principles. Article III, § 21 does not require that the title index the contents of the Act and there is no restriction on the scope of a single subject provided it is encompassed in the title. If the provision of the Act fairly relates to the subject, it will meet constitutional requirements. Objections to a legislative act on the grounds that it embraces more than one subject not adequately expressed in its title should be grave, and the conflict between the statute and the constitution must be plain and manifest, before it may be justifiably declared unconstitutional and void. We also held that sound policy and legislative convenience dictate liberal construction of the title and the subject matter in reviewing compliance with Article III, § 21.

*Simpson v. Tobin,* 367 N.W.2d 757, 767 (S.D.1985). We also addressed the purpose of Article III, § 21, as developed and explained in a "long line of our cases, to be as follows:"

> (1) prevent combining into one bill several diverse measures which have no common basis except, perhaps their separate inability to receive a favorable vote on their own merits;
> (2) prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and
> (3) fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the legislature.

*Id.*

[¶ 12.] The act at issue here is entitled "An Act to impose an excise tax on the

---

7. The statute in question was nearly identical to SDCL 10–27–1, which prohibits the use of injunctions "to restrain or delay the collection of any tax" and limits the remedy for wrongfully collected taxes to "payment under protest and an action to recover, as provided in SDCL 10–27–2."

gross receipts of personal communications system, wireless, and cellular telecommunications companies." Verizon contends that "the licensing, bonding and other restrictions of the statute are not in any way a necessary part of a tax statute, but rather are an independent regulatory regime that the title of the bill would not have put the public on notice was being adopted as part of a simple tax." [8] In addition, Verizon asserts that the special appropriations contained in the bill are separate subjects not contained in the bill title. We will address these two assertions separately.

■ [¶ 13.] Verizon claims throughout its brief that the licensing, bonding and other provisions of SDCL Chapter 10–33A create a regulatory regime. In particular, Verizon points to the imposition of tax licensing requirements (SDCL 10–33A–7, – 8), the criminalization of certain conduct relating to payment of the tax (SDCL 10–33A–17), the assignment of personal liability for payment of the tax on a corporation's officers (10–33A–18), the possible requirement of posting a bond before being issued a tax license (SDCL 10–33A–9, – 13, –18), and the provision providing for the refusal to issue a tax license to persons who are delinquent in payment of other taxes levied by the State of South Dakota (SDCL 10–33A–9).

[¶ 14.] Although these provisions may not be necessary to the implementation of a tax, we disagree with Verizon's characterization of the statutes as a regulatory regime in violation of the single subject rule of Article III, § 21 of the South Dakota Constitution. These sections all "fairly relate" to the gross receipt tax referenced

in the title. *See Simpson*, 367 N.W.2d at 767. These provisions all have a common basis, that is, to implement a gross receipt tax. *See Id.* The act as passed was not fraudulent or deceptive as to these matters. *See Id.*

[¶ 15.] The title of the act revealed that the act would impose an excise tax. A liberal construction of this title and its subject matter would encompass provisions providing for a means of assessing and collecting the tax, and rules for ensuring compliance with the tax statutes. In reality, this is all that the alleged "regulatory" provisions do. For example, the tax license application requirement that Verizon takes exception to simply requires a telecommunication company to provide its name, location, and other information the secretary may require.[9] Once this basic information is provided, the secretary "shall grant" the tax license. SDCL 10–33A–8. While the implementation of civil liability on certain corporate officers and criminalization of certain violations of the tax law do not fall within the subject of the title as clearly as the licensing requirements, the title's revelation of the new tax does "fairly apprise" the public of the potential for the inclusion of the type of civil and criminal sanctions included in this act. We have stated: "Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakably shown and there is no reasonable doubt that it violates fundamental constitutional principles." *South Dakota Association of Tobacco and Candy Distributors v. State*, 280 N.W.2d 662, 664–65 (S.D.1979). Verizon

8. Interestingly, after here claiming the provisions are unnecessary, in Verizon's later argument on separability it submits that without these provisions "the remaining sections will not be able to stand by themselves."

9. Currently the application requires an applicant to provide the following: (1) name; (2) address; (3) phone number; (4) contact person; (5) South Dakota Sales Tax Permit Number; and (6) a business description.

has not overcome the presumption of constitutionality as it relates to these provisions.

[¶ 16.] That being said, a more persuasive argument for violation of Article III, § 21, stems from the special appropriation provisions of the act. In addition to implementing a tax, the act appropriates the revenues which the tax produces. SDCL 10–33A–5, 10–33A–6. Sixty percent of the revenue is to be deposited into the property tax reduction fund, and forty percent of the revenue is to be deposited into the county telecommunications gross receipts fund. *Id.* The county fund is created by the act and the money in this fund is to be distributed to the counties four times a year. *Id.* Viken concedes that this is a special appropriation. The question is whether including such an appropriation in this act violated the South Dakota Constitution.

[¶ 17.] Initially we note that Article XII, § 2 of the South Dakota Constitution addresses appropriations other than those made in the general appropriations bill. It states in relevant part: "All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature." Although this Constitutional provision has not been made an issue in the case, it demonstrates the importance of appropriations and the particular scrutiny with which they should be analyzed.

[¶ 18.] Here the act was entitled "An Act to impose an excise tax on the gross receipts of personal communications system, wireless, and cellular telecommunications companies." The title does not suggest the specific purpose for which this revenue is to be raised or otherwise suggest that the revenue will be used or appropriated for a particular purpose. Concerning this line of reasoning, we find the

following language from our caselaw to be particularly helpful:

> The controlling principle is stated in 42 AmJur, Public Funds, § 47, p 749, as follows: 'As a general rule an appropriation a necessity for which is suggested by the title of an act, if it has congruity and proper connection with the subject or object stated therein, need not be specifically expressed in the title; * * *.' The elements of congruity and connection with the subject are not drawn in question. Our concern is whether the quoted language of the title is sufficient to indicate an appropriation is necessary to the accomplishment of the purpose of the act.

*Boe v. Foss*, 76 S.D. 295, 311, 77 N.W.2d 1, 10 (1956) (internal citations omitted). We acknowledged a similar analysis in *Independent Community Bankers Ass'n of South Dakota, Inc. v. State*, where we stated: "When the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will or may facilitate the accomplishment of the purpose so stated, are germane to its title." 346 N.W.2d 737, 741 (S.D.1984) (citation and quotations omitted).

[¶ 19.] We have explained that appropriations that facilitate and accomplish the stated purpose of a bill, even if such appropriations are not expressly addressed in the bill's title, do not violate our constitution. *Boe*, 76 S.D. at 311–12, 77 N.W.2d at 10–11. Such appropriations are germane to the title expressing the purpose of the legislation and the public is thereby fairly apprised of the appropriation. However, the title of House Bill No. 1104 proclaims only that a tax is being enacted, and says nothing of the purpose of the tax. Since the title of this bill does not even address the purpose of the tax, it obviously does

not indicate that an appropriation is necessary to accomplish its purpose. Therefore, we hold that the appropriation provisions now located at SDCL 10–33A–5 and SDCL 10–33A–6 violate Article III, § 21 of the South Dakota Constitution.

*Separability*

■■ [¶ 20.] Verizon claims that the unconstitutional provisions require us to strike down the entire act because the provisions are not separable. If the remaining legislation can take effect without the offending provisions, we attempt to uphold the remainder under the "doctrine of separability." We have said:

> Unconstitutional provisions of a statute may be extracted and the remainder left intact. *State ex rel. Wieber v. Hennings,* 311 N.W.2d 41 (S.D.1981). The "doctrine of separability" requires this court to uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section. *Hogen v. South Dakota State Board of Transportation,* 245 N.W.2d 493 (S.D.1976).

*South Dakota Educ. Association/NEA v. Barnett,* 1998 SD 84, ¶ 32, 582 N.W.2d 386, 394 (quoting *Simpson,* 367 N.W.2d at 768). Thus, separability is a two part test requiring (1) that the remaining sections can stand by themselves, and (2) that the Legislature would have intended the remaining sections to take effect. *Id.*

[¶ 21.] In this case, the remaining sections of this act can stand by themselves without the stricken appropriation provisions. The non-appropriation provisions in no way require the co-existence of the appropriations provisions in order to function properly or be effective. Thus, the first prong of the separability test is easily met. However, it is not as evident that the Legislature would have intended the remaining provisions to take effect without the invalidated sections.

[¶ 22.] Legislative history reveals that the original bill did not contain the appropriation provisions. This non-appropriating form of the bill was easily passed in the House by a vote of 60–8. The bill then moved to the Senate, where it was reviewed by the Senate State Affairs Committee. The committee voted 7–2 in favor of the bill, which still did not contain the appropriation provisions. It was only after the senate committee's vote that the appropriation provisions were added. The Senate then voted 24–11 to pass the bill. The amended bill went back to the House where it was passed by a vote of 67–2. The bill then went before the Governor, who exercised his line-item veto power to strike the appropriation provisions from the bill, believing that the provisions were unconstitutional. The bill went back to the Legislature, where the Senate voted to over-ride the veto by a vote of 26–7 and the House voted to override the veto by a vote of 57–12.

[¶ 23.] Since the House originally passed the act without the appropriation provisions, we can assume the House would have intended the act to survive without them. The Senate, however, never passed the bill without the appropriation provisions. Its intent is not as clear. However, Secretary Viken points out that the tax revenue generated by the act was included in the state budget. Without the tax, the State would have had a budget deficit in 2004 of over 3 million dollars. Therefore, based on the pre-appropriation provisions voting record in the House, in addition to the apparent necessity of the tax to balance the State budget, we conclude that the Legislature would have intended the bill to take effect without the appropriation sections. We find the doctrine of separability to be applicable to this

case. Despite the unconstitutionality of SDCL 10–33A–5 and 10–33A–6, the remaining provisions of SDCL Chapter 10–33A shall remain in effect.

*Federal Preemption*

[¶ 24.] The remaining issues raised by Verizon deal with whether federal law preempts SDCL Chapter 10–33A. Initially, we acknowledge that neither party disputes the State's ability to impose a gross receipts tax upon CMRS providers. It is the manner in which the tax is imposed and enforced that is at issue here.

*Field Preemption*

 [¶ 25.] First, Verizon asserts that conditioning the exercise of a federally licensed privilege on obtaining a separate, state license to exercise the same privilege is prohibited by general principles of field preemption. Verizon claims that because federal law gives the Federal Communication Commission the authority to license a CMRS provider, the state is preempted from any licensing requirement. The U.S. Supreme Court explained federal preemption in a particular field as follows:

> Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid. The ways in which federal law may pre-empt state law are well established and in the first instance turn on congressional intent. Congress' intent to supplant state authority in a particular field may be expressed in the terms of the statute. Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, if the Act of Congress ... touch[es] a field in which

the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or if the goals sought to be obtained and the obligations imposed reveal a purpose to preclude state authority. When considering pre-emption, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604–05, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532, 542–43 (1991) (internal citations and quotations omitted). In other words, "when Congress intends federal law to occupy the field, state law in that area is altogether preempted under the doctrine of field preemption." *Kroll v. Finnerty,* 242 F.3d 1359, 1364 (Fed.Cir. 2001) (citations and quotations omitted).

[¶ 26.] We acknowledge that Verizon has defined the preempted "field" specifically as the field of *licensing* CMRS providers. Verizon cites *Sperry v. Florida* in support of its field preemption argument on licensing. 373 U.S. 379, 385, 83 S.Ct. 1322, 1326, 10 L.Ed.2d 428, 432–33 (1963). *Sperry* involved federal preemption of the regulation of the practice of law before the U.S. Patent Office. Federal regulations allowed non-lawyers to obtain a federal license to appear before the Patent Office and to prosecute and present patent applications. The Florida bar sought to enjoin a federal licensee who was not licensed to practice law in Florida from prosecuting patent applications in Florida. The Supreme Court held that Florida could not impose licensing requirements or qualifications in addition to those already imposed under the federal law. The Supreme Court noted that the laws granting the federal licensing authority had no qualification that the licensing be consistent with

state law, and the court would not "read in" such a qualification. *Id.* at 385–86, 83 S.Ct. at 1326, 10 L.Ed.2d at 433.

[¶ 27.] In contrast to the unqualified licensing authority involved in *Sperry,* CMRS providers are expressly subject to various state regulation under the acts at issue here. *See* 47 USC § 332(c)(3)(A) (preserving the states authority to regulate the other terms and conditions of commercial mobile services.); Telecommunication Act of 1996, Public Law 104–104, § 601(c)(2), 110 Stat. 56, 143–44, *reprinted in* 47 USC § 152, Application Note 2 (preserving the state's ability to impose taxation laws). These qualifications to providing CMRS pursuant to a federal license make the principles of licensing preemption described in *Sperry* inapposite. *See e.g. In re Lucas,* 317 B.R. 195, 204 (Bankr. D.Mass. 2004) (distinguishing *Sperry* by recognizing that unlike federally granted authority to appear before the patent office, authority to appear in a bankruptcy case is qualified by the requirement that such appearances be consistent with proper state regulation.)

[¶ 28.] *Sperry* is further distinguished from the case at hand by the nature of the "licensing" in the respective cases. The Court in *Sperry* determined that the state retained authority to control the practice of law in Florida "except to the limited extent necessary for the accomplishment of the federal objectives." *Sperry,* 373 U.S. at 402, 83 S.Ct. at 1335, 10 L.Ed.2d at 442. The federal objective in issuing federal patent licenses is, at least in part, to regulate the conduct and qualifications of those practicing patent law before the patent office. *See Id.* at 402, 83 S.Ct. at 1334–1335, 10 L.Ed.2d at 442 ("[T]he State is primarily concerned with protecting its citizens from unskilled and unethical practitioners, interests which, as we have seen, the Patent Office now safeguards by test-ing applicants for registration, and by insisting on the maintenance of high standards of integrity.") The State of Florida was attempting to achieve the same objective through its licensing requirements. This obviously interfered with the accomplishment of the federal objectives.

[¶ 29.] Considering the FCC licensing requirements involved in this case, the federal objective was addressed in *Cincinnati Bell Telephone Co. v. F.C.C.* as follows:

In its *Second Report and Order,* the FCC noted that it had statutory authority to allocate licenses by auction under 47 U.S.C. § 309(j), which commands the FCC to establish criteria for license eligibility that would "promot[e] economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants...." *Id.* at 7707; 47 U.S.C. § 309(j)(3)(B) (Supp. V 1994). The FCC concluded that Section 309(j)(3)(B) reflected an explicit congressional approval of promoting competition in the industry and of a wide distribution of Personal Communications Service licenses. *Second Report and Order,* 8 F.C.C.R. at 7707. The FCC also concluded that its goal was to promote broad participation by wireless communications businesses in Personal Communications Service, ensure that existing Cellular operators did not exert undue market power, but at the same time take advantage of the Cellular operators' expertise and existing infrastructures for the expeditious development of the new Personal Communications Service.

*Cincinnati Bell Telephone Co. v. F.C.C.,* 69 F.3d 752, 757 (6thCir.1995). The federal

objective of promoting competition and providing for a wide distribution of licenses is completely unrelated to South Dakota's licensing objective. The South Dakota tax license seeks merely to aid in the efficient and effective administration of a valid state tax. Therefore, because the federal authority over licensing and regulation of telecommunication companies is qualified and expressly allows various state and local regulation, and also because the state tax licensing objective is unrelated to the federal licensing objective, the principles of field preemption found in *Sperry* are not applicable.

[¶ 30.] However, the federal acts at issue do contain express preemptive language in relation to certain aspects of CMRS regulations. The express preemption issues and the statutes from which they are derived are addressed separately below.

*The Telecommunications Act and the Safe–Harbor of Section 601*

■ [¶ 31.] 47 USC § 253(a) states: No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

Under this statute, if any provision of SDCL Chapter 10–33A prohibits or has the effect of prohibiting the ability of an entity to provide telecommunication services, the provision would be preempted and invalid. Congress, however, provided a "state tax saving provision" in connection with this preemptive statute.

[¶ 32.] The law provides in relevant part: "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or supersession of, any State or local law pertaining to taxation". Telecommunication Act of 1996, Public Law 104–104, § 601(c)(2), 110 Stat. 56, 143–44, *reprinted in* 47 USC § 152, Application Note 2.

[¶ 33.] By including the tax saving provision of § 601(c)(2), Congress clearly expressed its intention of preventing 47 USC 253(a) of the Telecommunications Act of 1996 from interfering with a state's ability to impose and collect taxes from CMRS providers. Further, a liberal interpretation of the state tax saving provision is supported by the Supreme Court's statement that "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387, 396 (1993). Although the exact function and relationship between each section of SDCL Chapter 10–33A and the gross receipt tax varies, there is no question that each of the sections "pertain to" a state taxation law. Accordingly, the statutes at issue all fall within the safe-harbor of Section 601. Therefore, the restrictions of 47 USC § 253 are inapplicable. However, since the state tax saving provision limits its application to the provisions and amendments of the Telecommunications Act of 1996, it is inapplicable to the Communications Act of 1934 provision found in 47 USC § 332(c)(3)(A), as amended by the Omnibus Reconciliation Act of 1993.[10] *See Boomer v. AT & T Corp.*, 309 F.3d 404, 423 (7thCir.2002). Therefore, the preemp-

---

**10.** Although 47 USC § 332(c)(3)(A) was enacted as part of the Omnibus Budget Reconciliation Act of 1993, the parties and much of the caselaw refer to it only as part of the Communications Act of 1934, without mention of the Omnibus Budget Reconciliation Act. For this reason, we refrain from any further reference to the Omnibus Budget Reconciliation Act and will address § 332(c)(3)(A) as part of the Communications Act, which it amended.

tive force of 47 USC § 332(c)(3)(A) must be separately addressed.

*Section 332(c)(3)(A) of the Communications Act of 1934*

[¶ 34.] While 47 USC § 332(c)(3)(A) prohibits a State from regulating market entry generally, it authorizes the State to regulate and impose other requirements on telecommunication service providers. The statute provides:

> Notwithstanding sections 152(b) and 221(b) of this title, *no State* or local government *shall have any authority to regulate the entry of* or the rates charged by *any commercial mobile service* or any private mobile service, *except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.* Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates.

47 USC § 332(c)(3)(A) (emphasis added). Verizon has taken the position that any condition, restriction or barrier to its ability to enter or remain in any market within South Dakota violates the Communications Act. This position is incompatible with the act's express grant of limited regulatory power to the States and is inconsistent with the general purpose of the Communications Act.

[¶ 35.] The importance of a law's purpose to the issue of preemption has been addressed by the Supreme Court:

> [T]he purpose of Congress is the ultimate touchstone in every pre-emption case. As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose. Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485–86, 116 S.Ct. 2240, 2250–51, 135 L.Ed.2d 700, 716 (1996) (internal citations and quotations omitted).

[¶ 36.] The North Dakota Supreme Court has described the purpose of the preemption provision of the Communications Act as follows: "(1) to ensure that similar mobile services are subject to consistent regulatory treatment; and (2) to impose only the level of regulation necessary to promote competition and protect mobile communications customers." *Consolidated Telephone Co-op. v. Western Wireless Corp.,* 637 N.W.2d 699, 703 (N.D. 2001) (citing *Bell Atlantic Mobile, Inc. v. Dep't. of Pub. Util. Control,* 253 Conn. 453, 754 A.2d 128, 132 (2000)). The FCC has expressed its belief that "that Congress ... intended generally to preempt state and local rate and entry regulation of all commercial mobile radio services to ensure that similar services are accorded similar regulatory treatment and to avoid undue regulatory burdens, consistent with the public interest." *In re Implementation of Sections 3(N) and 332 of the Communications Act, Regulatory Treatment of Mobile Services, Second Report and Order,* 9 FCCR 1411, 1504 (1994). We agree that

the federal preemption was intended by Congress to promote competition and prevent burdensome regulation.

[¶ 37.] The general purpose of promoting competition and avoiding undue regulatory burdens does not support Verizon's contention that *any* barrier or condition to operating within the State's borders is invalid and improper. This is particularly true considering Congress has reserved various regulatory and taxing powers to the States. *See* 47 USC § 332(c)(3)(A); *See also* 4 USC § 119–126 (codifying the Mobile Telecommunications Sourcing Act, which provides call origination rules for the purpose of imposing state taxes.) In fact, the federal courts have approved the placement of some barriers to a CMRS provider's ability to compete within a market. This approval demonstrates that the Communications Act is not an absolute bar to any and all restrictions, direct or indirect, on a CMRS provider's access to markets within a state.

[¶ 38.] One such barrier has been franchise fees imposed by local governments. Courts have consistently ruled that local governments may charge CMRS providers franchise fees and impose related franchise requirements for use of rights of way as long as the fees are applied on a competitively neutral and nondiscriminatory basis. *See In re Metromedia Fiber Network, Inc.*, 313 B.R. 153, 157–61 (Bankr.S.D.N.Y. 2004); 47 USC 253(c). Such fees and requirements fall under the savings provision of 47 USC § 253(c), but just like the tax savings provision, such requirements are not excepted or saved from § 332(c)(3)(A). *See* 47 USC § 253(e) ("Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.") Although requiring a fee may be a barrier to entering a market; fees, when properly charged, have consistently been upheld.

*See TCG Detroit v. City of Dearborn*, 206 F.3d 618, 625 (6thCir.2000). The following language from the Federal Second Circuit Court of Appeals illustrates this point:

Under the language and legislative history of Section 253, municipalities clearly retain their longstanding capacity to manage their rights of way and obtain reasonable compensation. It may be, therefore, that denial of access would be an appropriate remedy where a telecommunications company refuses to consider a city's proper request for fees or disregards a locality's attempt to manage its rights of way. . . . Section 253 does not assert that any telecommunications company may gain unconditional access to all cities' streets, but instead that cities must not raise barriers to entry that are discriminatory or not competitively neutral.

*City of Rome, N.Y. v. Verizon Communications, Inc.*, 362 F.3d 168, 181 (2ndCir.2004).

[¶ 39.] It is these same franchise fee cases against *local governments* (not state officials) that Verizon cites as authority supporting its position that any and all barriers to providing CMRS in South Dakota are preempted. However, the issue in the cited cases was whether franchise licenses from the local governments could be withheld at the discretion of the local authorities and/or conditioned on burdensome requirements. *See City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175–76 (9thCir.2001) (" '[A]ny 'process for entry' that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decisionmakers to grant or deny permission to use the public rights-of-way 'may . . . have the effect of prohibiting' the provision of telecommunications services in violation of the [Act].' " (citing *Bell Atl. v. Prince George's County*, 49 F.Supp.2d 805,

814 (D.Md.1999)). The cases can be distinguished on at least two grounds. First, the parties involved and the nature of the requirements/barriers are different. Second, the statute at issue was 47 USC § 253, which preempts state regulation that prohibits or has the "effect of prohibiting" CMRS. We have already determined that the South Dakota tax statutes at issue here are not subject to 47 USC § 253 because of the tax savings provision of Section 601(c)(2). Therefore we are not concerned with whether our statutes have the "effect of prohibiting" CMRS; rather, we must determine whether our statutes regulate market entry in violation of § 332(c)(3)(A).

[¶ 40.] After reviewing the statutory framework of the Communications Act and the intent and purpose of Congress in enacting its provisions, we cannot agree with Verizon's all encompassing interpretation of the "regulation of market entry." Congress did not intend to prohibit any state activity having the effect of interfering with communications services or creating a barrier to market entry. 47 USC § 332(c)(3)(A) itself provides an exception to the prohibition of market entry regulation when it states, "this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." [11] Therefore, even if a regulation of other conditions of commercial mobile services arguably results in market entry barriers, such regulation is expressly authorized.

[¶ 41.] In an analogous situation involving the FCC's preemption of state and local entry regulation of Satellite Master Antenna Television, the FCC stated that States could still regulate in other areas as long as the regulation was not "undertaken as a pretext for the actual purpose of frustrating achievement of the preeminent federal objective", which was the development of broadband communications. *Earth Satellite Communications, Inc.*, 95 FCC2d 1223, ¶ 21 (1983). In the present case, the licensing "requirements" at issue do not frustrate the purpose of the Communications Act and are not a pretext for regulating market entry. They are valid, reasonable and indiscriminately applied administrative requirements intended to aid in the collection of valid state taxes.

[¶ 42.] Having determined that Congress did not intend the prohibition of market entry regulation to encompass all barriers or conditions to entry, we now look to the provisions of SDCL Chapter 10–33A. Specifically, we must determine if the barriers or conditions to market entry created by these provisions are prohibited.

[¶ 43.] The foremost condition to entering the South Dakota CMRS market is obtaining a tax license. *See* SDCL 10–33A–7. We agree with Verizon that Congress intended to prohibit state "regulation" of market entry. Further, we agree that a main source of regulation is legal license requirements. *See American Prof'l Testing Serv., Inc. v. Harcourt*

---

11. A House of Representatives report stated:
It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By terms and conditions, the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g.zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."
H.R.REP. No. 103–111 (1993), *reprinted in* 1993 USCCAN 378, 588.

*Brace Jovanovich,* 108 F.3d 1147, 1154 (9thCir.1997). However, the fact that license requirements are a main source of market entry regulation does not mean license requirements are *always* regulations. As discussed above, the federal courts affirmative rulings on other local communications requirements, the express allowance of the regulation of "other terms and conditions" contained in 332(c)(3)(A), as well as the general purpose of the act in relation to preemption, show that Congress did not intend to prohibit any law which could have the effect of creating even an insubstantial and indirect barrier to entry. Instead, Congress intended a less prohibitive and more direct definition of "regulation of market entry."

[¶ 44.] Whether the licensing requirements of SDCL Chapter 10–33A are, in effect, regulations of market entry as prohibited by federal law depends upon the nature of the requirements or conditions placed upon obtaining the license. *See AT & T Communications of the Pacific Northwest, Inc. v. City of Eugene,* 177 Or.App. 379, 35 P.3d 1029, 1050 (2001) (addressing registration requirements and stating: "The company has cited no authority for the proposition that requiring all providers to supply minimal information to the city amounts to a regulation of entry within the meaning of the statute, and we have found none.") The "requirements" for obtaining a South Dakota Gross Receipts Tax License are to provide your business name and location to the State and to have paid all taxes previously as-

sessed by the State. SDCL 10–33A–7, –9. In addition, criminal and civil sanctions and simple record keeping requirements are imposed on CMRS providers in relation to the tax. SDCL 10–33A–15, –17, –18. These provisions are addressed below.

*Business information and sanctions*

[¶ 45.] SDCL 10–33A–7 requires a telecommunications company to "set forth the name under which the applicant transacts or intends to transact business, the location of the place of business, and such other information as the secretary may require." [12] We are not persuaded that this is the "regulation of market entry" anticipated and prohibited by 47 USC 332(c)(3)(A). This indiscriminate and non-prohibitive condition to entry is little more than a notice requirement. Specifically, a provider must notify the State to whom and what location it should send tax information. In this manner, the licensing requirements are analogous to the registration requirements upheld in *City of Eugene,* 35 P.3d at 1050 (holding that requiring providers to provide minimal information is not regulation).

[¶ 46.] There is no dispute that South Dakota may impose a gross receipts tax on CMRS providers. It seems obvious that the power to tax necessarily requires the power to enforce a tax. This is, in fact, all that the allegedly improper tax provisions do. South Dakota is not regulating market entry simply by requiring market participants to notify the State and obtain a

---

**12.** Verizon's assertion that the statutes give the secretary authority to promulgate rules that would constitute market entry regulation in violation of federal law is incorrect. "[W]e presume the Legislature intended to enact a valid statute, and where a statute can be construed so as not to violate the constitution, we will adopt such a construction." *State v.*

*Martin,* 2003 SD 153, ¶ 26, 674 N.W.2d 291, 300 (citation and quotations omitted). Since the Legislature does not have authority to regulate market entry of CMRS providers, it follows that it did not delegate such authority to the Secretary of Revenue and Regulation, nor did it grant authority to promulgate any other illegal rules.

tax license. Neither has it undertaken market entry regulation by imposing basic record keeping requirements to aid in the administration of the tax. *See* SDCL 10–33A–15. Further, we do not find that imposing criminal and economic sanctions on those who violate the tax laws to be market entry regulation in violation of the Communications Act. Stretched to its logical extreme, such a broad interpretation of the regulation of market entry could encompass any attempted application of state civil or criminal law to a CMRS provider.

[¶ 47.] By analogy, various federal courts have rejected such a broad interpretation of the regulation of *rates* under 332(c)(3)(A). *See Brown v. Washington/Baltimore Cellular, Inc.,* 109 FSupp2d 421, 423 (D.Md.2000) ("Congress did not preempt all claims that would influence rates, but only those that involve the reasonableness or lawfulness of the rates themselves."); *Moriconi v. AT & T Wireless PCS, LLC,* 280 FSupp2d 867, 876 (E.D.Ark.2003) (finding § 332 of the Communications Act "lacks the extraordinary preemptive power necessary to convert Plaintiff's state law challenges to Defendant's marketing and advertising practices into a federal claim."). In *Phillips v. AT & T Wireless,* the court stated that "not all matters affecting wireless providers' rates are preempted rate regulation under the FCA." 2004 WL 1737385, 7 (S.D.Iowa July 29, 2004). Similarly, we find that not all matters affecting market entry are preempted market entry regulation.

[¶ 48.] We believe that Congress did not intend to prohibit states from imposing basic notice and record keeping requirements concerning the imposition of lawful taxation nor did it intend through the enactment of 47 USC 332(c)(3)(A) to prohibit economic and criminal sanctions for violation of state tax laws.

*Delinquency in payment of state taxes*

[¶ 49.] One of the provisions of the tax law, SDCL 10–33A–9, gives the Secretary of Revenue the discretion to refuse to issue a license if the applicant is delinquent in paying other taxes. It also allows the Secretary to require a bond or other security as a condition to staying in business. It provides:

> The secretary may refuse to issue a telecommunications gross receipts tax license to any person who is delinquent in payment of other taxes levied by the State of South Dakota. The secretary may also require an applicant to furnish to the state a bond, or other adequate security, as security for payment of any gross receipts tax that may become due, or require a bond or security as a condition precedent to remaining in business as a telecommunications company.

SDCL 10–33A–9. In addition, SDCL 10–33A–11 provides for the revocation of the license for failure to file a return or pay the tax; SDCL 10–33A–13 provides for reinstatement of a license; and SDCL 10–33A–17(5) & (6) criminalize operating without a license or after a license has been revoked or cancelled.

[¶ 50.] Whether these conditions to providing CMRS in South Dakota constitute the regulation of market entry is a much closer question. While the prohibition of state regulation of market entry is not ambiguous, what constitutes such regulation and what falls within the "other terms and conditions" exception is not so obvious. Initially we point out that these laws do not prevent any entity from entering the South Dakota market, but only prohibit those that are already in the South Dakota market and have not paid their taxes from continuing to do business within the State as a CMRS provider. Only those businesses that refuse or otherwise fail to pay their South Dakota taxes

will be subject to the sanction. We are not convinced that the application of these statutes is the regulation of market entry anticipated and prohibited by the Communications Act. Further, the purpose of these delinquency provisions is to aid in the enforcement of valid state taxes and not to regulate market entry.[13] Therefore, because the delinquency provisions do not impose barriers to "entry" but impose requirements for continued operations, and because the delinquency provisions are not "regulations" as intended or contemplated by Congress, and because such provisions may even be included under the "other terms and conditions" exception to § 332(c)(3)(A), we find that they are not preempted by 47 USC § 332(c)(3)(A).

[¶ 51.] Accepting Verizon's position, a state would be allowed to impose certain regulations, conditions, and requirements (including taxes) on telecommunications service providers, yet states would not be allowed to sanction such providers or prohibit them from operating within their boundaries when they refuse to comply with the requirements. It seems a tenuous position to assert that the intent of Congress was to allow regulation and taxation while completely prohibiting the most obvious and effective sanctions for violation of these valid state law mandates.

[¶ 52.] Since we have determined that the various provisions within SDCL Chapter 10–33A are not preempted by federal law, we need not reach the issue of the separability of any of these provisions.

[¶ 53.] The trial court is reversed as to Issue 1, reversed in part as to Issue 2 and affirmed on Issue 3.

[¶ 54.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.

---

13. Concerning the bonding requirements found in SDCL Chapter 10–33A, a CMRS provider is subject to the possibility of a bonding requirement only if the provider is delinquent in South Dakota taxes, or if the responsible corporate officer elects not to be personally liable for failure to file returns or pay the tax due. *See* SDCL 10–33A–9, –18. In such cases, without the bonding option the delinquent provider would be unavoidably prohibited from continuing operations within the state and the responsible officers could not escape personal liability. The bonding option gives providers an opportunity to continue to operate despite the delinquency and also allows officers to avoid personal liability. In this respect, the bonding options remove rather than impose barriers.