

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| COLLECTOR OF WINCHESTER, MISSOURI, AND CITY OF WINCHESTER, MISSOURI, | ) ) ) ) | No. ED109513 |
| Respondents, | ) ) | Appeal from the Circuit Court of St. Louis County |
| vs. | ) ) | 10SL-CC02719 |
| CHARTER COMMUNICATIONS, INC., AND CHARTER COMMUNICATIONS, LLC, | ) ) ) ) | Honorable Michael T. Jamison |
| Defendants, | ) ) | |
| CHARTER FIBERLINK – MISSOURI, LLC, AND CHARTER ADVANCED SERVICES (MO), LLC, | ) ) ) ) | |
| Appellants. | ) | Filed: December 13, 2022 |

Michael E. Gardner, C.J., James M. Dowd, J., and Lisa P. Page, J.

## OPINION

This class action arose when Appellants Charter Fiberlink – Missouri, LLC, and Charter

Advanced Services (MO), LLC,[1] declined to pay to the City of Winchester, Missouri, and to the

---

[1] Charter Communications, Inc., and Charter Communications, LLC are no longer parties to this action. In the interest of clarity and brevity, we refer to their subsidiaries, Appellants Charter Fiberlink and Charter Advanced Services, as "Charter" collectively unless a specific reference to either Appellant individually is necessary.

123 other Missouri jurisdictions comprising the class here,[2] the business license tax each jurisdiction imposed, pursuant to ordinance, on telephone service providers doing business in their jurisdictions. Charter opposed the taxes on a number of bases addressed below including federal preemption in which Charter claims the technology it employs to deliver its telephone service, known as "voice over internet protocol" or VoIP, is not a "telecommunications service" that Class Members may tax, but is an "information service" which they may not.

Winchester instituted this action on July 9, 2010, and so began 10 years of litigation before the trial court – the Honorable Michael T. Jamison presiding – in which the court issued numerous partial judgments and orders. In its final judgment, the court found in favor of the Class and ordered Charter to pay a total of $39,048,386 in damages consisting of the unpaid taxes from July 9, 2005 to December 22, 2020, pre-judgment interest, post-judgment interest, attorney's fees, and legal expenses.

Charter now appeals, raising a total of six points. Points I, II, III, V, and VI relate to all Class Members, and Point IV relates to St. Louis County only.[3] In Points I and II, Charter argues that given its use of VoIP technology to deliver telephone service, the Telecommunications Act of 1996, 47 U.S.C. §§ 151 et seq. ("the Telecom Act of 1996" or "the Telecom Act"), and the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521-573 ("the Cable Act of 1984" or "the Cable Act"), preempt the Class Members' business license tax ordinances at issue in this case. In Point III, Charter asserts the trial court erred in finding that Charter Fiberlink was a "telephone company" providing "telephone service" subject to the Class Members' business license taxes because the relevant tax-enabling statutes and the ordinances at issue failed to

---

[2] The class in this case consists of 124 jurisdictions: the City of Winchester (the class representative), 122 other cities/municipalities, and St. Louis County. In the interest of clarity and brevity, we will refer to the 124 jurisdictions as the "Class" or "Class Members" collectively unless a more specific reference to a party individually or parties collectively is necessary.
[3] We will consider Charter's points on appeal in this order for ease of reading.

2

define the terms "telephone company," "telephone," or "telephone service" to specifically

include VoIP-enabled telephone service. In Point V, Charter contends the trial court erred by

failing to give individualized treatment and effect to each Class Member's ordinance language

given differences among the various ordinances. In Point VI, Charter argues the trial court erred

by hearing the case at all because the alleged ordinance violations at issue here should have been

adjudicated in municipal court. And in Point IV, Charter claims the trial court should have

dismissed St. Louis County from the case because Missouri's tax-enabling statute, § 66.300,[4]

grants first-class counties the power to tax "exchange telephone service" and St. Louis County is

no longer a first-class county by virtue of a 1995 amendment to Missouri Constitution Art. VI, §

18(a). Because we find in favor of all Class Members on Points I, II, III, V, and VI, and because

we find in favor of St. Louis County on Point IV, we affirm the judgment of the trial court.

## I. BACKGROUND

### A. Relevant Facts Including Factual Findings Made by the Trial Court

Winchester, the Class representative, is a fourth-class city located in St. Louis County.

Since 1968, Winchester has imposed a license tax on businesses that supply "telephone or

telephone service" in Winchester under the following code provision:

> Pursuant to the laws of Missouri, every firm, person or corporation now or hereafter
> engaged in the business of supplying or furnishing telephone or telephone service
> in the City of Winchester, Missouri, shall pay to the said City as a license or
> occupational tax six percent (6%) of the gross receipts derived from such business
> within the said City.

Winchester Municipal Code § 615.150.[5]

Charter employs VoIP technology to provide telephone service to its customers in

Missouri. VoIP enables real time, two-way calling between two VoIP customers or between a

---

[4] Unless otherwise indicated, all statutory references are to the Revised Statutes of Missouri (Cum. Supp. 2010).
[5] Previously numbered as § 640.010.

VoIP and a non-VoIP, traditional telephone customer over Charter's broadband cable network. When a Charter customer places a call to another VoIP user, the sound waves created by the customer's voice are converted into digital data packets which are then transmitted over Charter's network to the call's recipient whereupon the data packets are converted back to sound waves. When a Charter customer calls a traditional telephone user, the data packets are converted into electrical signals in order to transmit the voice content to a recipient over the traditional public switched telephone network or PSTN, which has been in use since the 19th century. Charter's VoIP service is considered to be "interconnected" because Charter's VoIP customers can make and receive telephone calls in real time with other VoIP users or with traditional PSTN users.

In its advertising, Charter markets its VoIP-enabled telephone service as "Charter Phone" and provides the service through its franchised cable system over which it also delivers voice, video, and other data including cable television. Charter Phone uses a simulated dial tone, uses phone numbers, and provides features such as call forwarding, call screening, call waiting, speed dialing, repeat dialing, and three-way calling. Additionally, Charter describes its telephone service as "not an internet phone service, requiring special phones and internet connections, but as a traditional local and long-distance telephone service that makes use of the latest technology, VoIP."

The trial court found that Charter advertises Charter Phone as being "just like traditional wireline services, [and that] Charter Phone works through regular telephone jacks and phones, and provides access to 911 emergency services and directory listings." The trial court also found that "Charter offers its customers regular telephone service that happens to be provided using a different technology [, and that] Charter considers its service functionally equivalent to that provided by traditional wire-line service providers."

4

In 2000, Charter formed Charter Fiberlink to provide telephone service using VoIP to its Missouri customers. Charter Fiberlink is licensed to do business in Missouri only. In April 2001, it received a certificate from the Missouri Public Service Commission ("the Public Service Commission" or "the PSC") to provide basic local and interexchange telecommunications services in Missouri. In its filings with the PSC, Charter Fiberlink represented it was a competitive facilities-based provider of telephone services, that it was a telephone company, and that it provided local exchange service.

Charter Fiberlink did not register with the PSC as an interconnected VoIP provider under § 392.550,[6] but instead registered as a competitive local exchange carrier, i.e., a traditional telephone service provider, through which it operated and provided its VoIP-enabled telephone service. Also, for tax purposes, Charter Fiberlink considered itself a traditional telephone service provider. As such, it collected through its customer billing any required taxes and forwarded them to the appropriate taxing agency.

In March 2013, Charter transferred its Charter Phone service from Fiberlink to a new subsidiary called Charter Advanced Services. Like Fiberlink, Charter Advanced is licensed to do business in Missouri only, but unlike Fiberlink, Charter Advanced registered as a VoIP provider under § 392.550. When it registered in March 2013, Charter Advanced agreed "going forward to charge, collect, and remit fees and surcharges in the same manner as . . . local exchange telecommunications companies including . . . [a]ny applicable license tax."

As a cable company, Charter pays a franchise fee to "franchising authorities" such as Winchester, other Missouri municipalities/cities, and St. Louis County, which have granted

---

[6] Section 392.550.1 provides that no person, corporation, or other entity shall offer or provide interconnected voice over internet protocol (VoIP) service as defined in § 386.020 without first having obtained a registration from the Public Service Commission allowing it to do so.

Charter a franchise to own and operate its cable system in each franchising authority's jurisdiction.

## B. Procedural History

Winchester's first amended petition set forth two counts in equity; initially, St. Louis County was not a part of the suit and the proposed class consisted of only Winchester as a proposed class of "at least 100 Missouri municipalities" ("the initial proposed class members"). Count I sought a declaratory judgment that the initial proposed class members' ordinances were applicable to Charter's gross receipts generated by its telephone business in each of those jurisdictions. Count II sought from Charter the back-taxes owed along with penalties and interest in the event the trial court found in favor of the initial proposed class members on Count I. In response to Winchester's petition, Charter raised a number of affirmative defenses including federal preemption under the Telecom Act of 1996 and the Cable Act of 1984.[7]

In September 2013, Charter moved to dismiss a parallel suit St. Louis County had filed against Charter which sought relief similar to Winchester's petition. Charter claimed that in light of the 1995 Amendment to Mo. Const. Art. VI, § 18(a), St. Louis County, as a charter county, was no longer considered a first-class county and, therefore, it lost the authority under § 66.300 to tax gross receipts of exchange telephone service providers. The trial court denied Charter's motion. In August 2015, St. Louis County became a member of the class in this case.

In May 2013, the parties filed cross-motions for summary judgment on the question of whether Charter was a "telephone compan[y]" for purposes of § 94.270, the license-tax-enabling

---

[7] Charter also challenged Winchester's role as class representative, under § 71.675.1's prohibition of a city or town bringing an action as a representative member of a class to enforce or collect any business license tax imposed on a telecommunications company. This claim was rejected when the Missouri Supreme Court declared § 71.675 unconstitutional in *State ex rel. Collector of Winchester v. Jamison*, 357 S.W.3d 589, 591, 595 (Mo. banc 2012).

6

statute for fourth-class cities, and whether Charter supplied or furnished "telephone or telephone service in the City of Winchester," within the meaning of Winchester Municipal Code § 615.150. The trial court found in favor of Winchester on those questions and entered summary judgment in which it found, *inter alia*, that:

> Charter is a 'telephone compan[y]' within the plain meaning of § 94.270, and that Charter Phone is a 'telephone service' within the plain meaning of Winchester Municipal Code § 615.150. Because Defendants admit – collectively – that 'Charter . . . provides an interconnected VoIP service to its customers in Winchester . . . ', they are subject to Winchester's license tax.

> Also in May 2013, the trial court granted St. Louis County's summary judgment motion finding that:

> Section 392.550 clearly requires such entities to pay the same license taxes as local exchange carriers. The legislative intent is clear that while Interconnected VoIP carriers were to be excused from some regulation by the Public Service Commission, they were not to be excused from paying the same license and other taxes as their competitors. Charter implicitly admits as such when it acknowledges that its new registered VoIP subsidiary [Advanced] has agreed to pay local license taxes.

As to St. Louis County's claims against Fiberlink, the trial court found that:

> Charter Fiberlink is, and has been during all times relevant to this lawsuit, a public utility engaged in the business of supplying or furnishing exchange telephone service in the part of the county outside incorporated cities and is therefore liable to pay to the County, as a license or occupational tax, five percent of the gross receipts derived from such business within the unincorporated areas of the County.

In February, April, and May 2015, the trial court heard Winchester's Rule 52.08[8] motion for class certification on behalf of itself and 122 other municipalities/cities; again, St. Louis County later became a member of the class in August 2015. On June 18, 2015, the trial court granted class certification. Due to the differences among the different jurisdictions' ordinances, the court created five subclasses under Rule 52.08(c)(4) for case management purposes. The

---

[8] All references to Rule 52.08 are to Missouri Supreme Court Rule 52.08 (effective from January 1, 2006 to the present).

subclasses were intended to lend organization and efficiency to the proceedings and to address some of Charter's concerns regarding the differences among the various jurisdictions' ordinances. Charter unsuccessfully challenged the trial court's grant of class certification by way of writ petitions in this Court and in the Missouri Supreme Court.

The five subclasses are as follows:

Subclass 1: Class members that impose a license (or "gross receipts") tax on businesses supplying or furnishing telephone service, including telecommunications service;

Subclass 2: Class members that impose a license (or "gross receipts") tax on businesses supplying or furnishing exchange telephone service;

Subclass 3: Class members that do not separately define the term "gross receipts" in their telephone license tax codes;

Subclass 4: Class members that generally define the term "gross receipts" in their telephone license tax codes as excluding "discounts, credits, refunds, sales taxes [and sometimes other taxes, such as license] and uncollectible accounts"; and

Subclass 5: Class members that generally define the term "gross receipts" in their telephone license tax codes as excluding the following: such receipts as represent charges for message rate toll, or long distance telephone service, charges for exclusive interstate service of any kind, charges for Morse, telegraph, television or radio program transmission facilities, or for other services furnished exclusively and permanently in connection with services extending beyond the boundaries of the city, charges for the billing and collecting for telegrams, charge for the sale of and advertising in telephone directories, charges for rental of plant facilities or other property not currently used by any such company in furnishing its telephone services, and charges which combine both receipts which are herein taxed and which are herein excepted in all cases in which the demonstrable cost to any such telephone company, in making a separation

8

between the revenues taxed and those excepted, shall exceed the evident revenue to be derived therefrom by the city hereunder.

On November 29, 2017, in connection with additional summary judgment motions filed by the parties, the trial court ruled that it had the authority pursuant to the Declaratory Judgment Act, § 527.010 et seq., to declare rights and other legal relations created under the Class Members' ordinances. On that same date, the trial court granted the Class partial summary judgment ("November 2017 grant of partial summary judgment") declaring the Class Members could tax the revenue Charter derived from its VoIP-enabled telephone service in varying amounts depending on the Rule 52.08(c)(4) subclass to which each jurisdiction belonged.

After a three-day bench trial in August 2019, the court issued its December 6, 2019, findings, conclusions, and judgment ("December 2019 judgment") in favor of the Class in the amount of $22,473,719, a damages figure it derived substantially from a damages model Charter submitted. The damages award spread across the five subclasses of jurisdictions. In addition, the trial court found (1) that neither the Telecom Act nor the Cable Act preempt the Class's business license tax ordinances at issue in this case, (2) that a five-year statute of limitations applied so the court required the parties to submit updated pre-judgment interest calculations, and (3) that Winchester, as the Class representative and prevailing party, was entitled to attorney's fees but no penalties.

Just three weeks later, the Missouri Supreme Court handed down *City of Aurora v. Spectra Communications Group, LLC*, 592 S.W.3d 764 (Mo. banc 2019). There, like here, the Supreme Court considered a multi-jurisdiction suit brought against a telephone service provider (CenturyLink), for the underpayment of business license taxes. *Id*. at 771-73. The jurisdictions in *Aurora*, like those here, had "telephone service" or "exchange telephone service" in the language of their ordinances. *Id*. at 783. As relevant to this case, the *Aurora* Court (1) upheld

9

the five-year statute of limitations in unpaid license tax cases, (2) affirmed the trial court's use of "all revenue" generated in each jurisdiction to calculate the amount of unpaid taxes owed in the absence of an express exclusion in a particular jurisdiction's ordinance of a class of revenue, (3) found prejudgment interest accrued at a rate of 9% from the start of the limitations period under § 408.020 until August 28, 2012, and thereafter at a rate dictated by § 71.625.2 RSMo Cum. Supp. 2012, (4) affirmed that no award of penalties was warranted, and (5) affirmed the exclusion of inter-carrier compensation from all of the jurisdictions' tax base calculation. *Id*. at 786-801.

In light of *Aurora*, the parties filed post-trial motions. Subsequently, on December 22, 2020, the trial court entered its final judgment in this case ("December 2020 final judgment") in which it amended its December 2019 judgment and any prior partial judgment to the extent they conflicted with or deviated from *Aurora*. The trial court's December 2020 final judgment found:

1. That this case was properly before it; thus rejecting Charter's claim that it belonged in the various municipalities' municipal courts;

2. That Charter Fiberlink and Charter Advanced owed and continue to owe the taxes described in the court's November 2017 grant of partial summary judgment, and in the December 2019 judgment, as modified by the December 2020 final judgment;

3. That the total damages award was $39,048,386 consisting of back-taxes owed, pre-judgment interest pursuant to § 408.020 until August 28, 2012 and thereafter pursuant to § 71.625.2 RSMo Cum. Supp. 2012, post-judgment interest, and attorney's fees and legal expenses; and

4. That after deducting fees and expenses, the net award to the Class was $28,972,239, which the trial court apportioned to the Class Members.

This appeal follows.[9]

## II.    GENERAL STANDARD OF REVIEW

The standard of review for cases decided by the circuit court without a jury is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).  This Court will affirm the judgment of the circuit court unless it misapplied the law, erroneously declared the law, the judgment is not supported by substantial evidence, or the judgment is against the weight of the evidence.  *JAS Apartments, Inc. v. Naji*, 354 S.W.3d 175, 182 (Mo. banc 2011) (citing *Murphy*, 536 S.W.2d at 32); *see also* Missouri Supreme Court Rule 84.13(d) (2022); *Craig-Garner v. Garner*, 77 S.W.3d 34, 36 (Mo. App. E.D. 2002) (under *Murphy*, "we view the evidence and permissible inferences therefrom in the light most favorable to the trial court's decision and disregard all contrary evidence and inferences").  To the extent Charter challenges the trial court's rulings on questions of law, our review is *de novo*.  *See P & J Ventures, LLC v. Yi Yu Zheng*, 479 S.W.3d 748, 753 (Mo. App. E.D. 2016).

"The construction of a statute is a question of law reviewed *de novo*[,]" and the "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue."  *State ex rel. Robison v. Lindley-Myers*, 551 S.W.3d 468, 472 (Mo. banc 2018) (citation omitted); *State v. Deck*, 303 S.W.3d 527, 533 (Mo. banc 2010) (emphasis added).  In addition, "taxing statutes must be construed strictly, and taxes are not to be assessed unless they are expressly authorized by law."  *St. Louis County v. Prestige Travel, Inc.*, 344 S.W.3d 708, 712 (Mo. banc 2011) (citation omitted).

---

[9] Charter filed a motion to supplement the record on appeal to add its May 2013 summary judgment motion, June 20, 2013 exhibits, and June 21, 2013 exhibits.  This motion to supplement the record was taken with the case and is now granted.  Winchester's motion to dismiss this appeal, which was also taken with the case, is denied.

11

### III.    CHARTER'S POINTS RELATING TO All CLASS MEMBERS

We first consider Charter's points on appeal relating to all Class Members – Points

Points I, II, III, V, and VI.

### A.    Charter's Points I and II Arguing Federal Law Preempts the Class Members' Business License Tax Ordinances Have No Merit

Charter's Points I and II on appeal argue, respectively, that the Telecom Act of 1996 and

the Cable Act of 1984 preempt the Class Members' business license tax ordinances at issue in

this case.  For the reasons discussed below, we hold these arguments have no merit.

#### 1.    General Law

Federal preemption is a question of law this Court reviews *de novo*.  *State v. Diaz-Rey*,

397 S.W.3d 5, 8 (Mo. App. E.D. 2013).  To determine if federal statutory preemption lies, the

purpose of Congress in enacting the federal statute is the ultimate touchstone, to be determined

by an examination of the text and structure of the federal statute.  *Id*.  Federal courts are reluctant

to give statutes preemptive effect and only do so if it is "the clear and manifest purpose of

Congress."  *U.S. v. Locke*, 529 U.S. 89, 107 (2000) (citation omitted).

Generally, federal regulation of an activity does not preempt state or local authorities

from taxing companies engaged in that activity.  *Kay-Decker v. Iowa State Bd. of Tax Review*,

857 N.W.2d 216, 228 (Iowa 2014).  No general principle of law is better settled or more

fundamental than that every state has general legislative power over all property within its

borders.  *Id*. at 229 (citing *Pullmans Palace Car Co. v. Com. of Pennsylvania*, 141 U.S. 18, 22

(1891)).

#### 2.    The Telecom Act of 1996 Does Not Preempt the Class Members' Business License Tax Ordinances

In Point I, Charter argues that the Telecom Act preempts the Class Members' business

license tax ordinances at issue here because Charter's VoIP-enabled interconnected telephone

service is not a "telecommunications service," which may be taxed and regulated at the state or local level, but instead is an "information service," the taxation of which is preempted by the Telecom Act.

Under the Telecom Act of 1996, "telecommunications services" are generally subject to concurrent regulation by both the Federal Communications Commission (FCC) and by the states. *See* 47 U.S.C. § 152(b); *see also* 47 U.S.C. section 153(53); *Louisiana Public Service Com'n v. F.C.C.*, 476 U.S. 355, 375 (1986) (similarly holding with respect to telephone service). As far as the regulation of "information service" is concerned, there is no express preemption in the Telecom Act. Instead, Charter relies here on certain judicial interpretations drawing on the definitional distinctions[10] between these two services and holding generally that "any state regulation of an information service [which] conflicts with the federal policy of non-regulation" is preempted by federal law. *Charter Advanced Services (MN), LLC v. Lange*, 903 F.3d 715, 717-20 (8th Cir. 2018) (quoting *Minnesota Public Utilities Com'n. v. F.C.C.*, 483 F.3d 570, 580 (8th Cir. 2007)). In *Lange*, the court held that the Minnesota Public Utilities Commission's regulation of Charter was preempted by the foregoing principle. 903 F.3d at 718; *see also* 47 U.S.C. §§ 153(53), (50), (24). Charter relies on *Lange* for its principal argument here that since its Charter Phone telephone service utilizes VoIP technology, it is not a telecommunications

---

[10] "[T]elecommunications service" is defined in the Telecom Act as "the offering of telecommunications for a fee directly to the public, . . . regardless of the facilities used." 47 U.S.C. § 153(53). "[T]elecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50). And "information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).

13

service but is an information service that is not subject to state or local regulation or taxation. *See Lange*, 903 F.3d at 717-20.

Whether VoIP is a telecommunications service or an information service is a question that has been "raging for years" in the telecommunications industry. *Federal Trade Commission v. Educare Centre Services, Inc.*, 433 F.Supp.3d 1008, 1017-18 (W.D. Tex. 2020) (quoting *PAETEC Communications, Inc. v. CommPartners, LLC*, No. 08-0397 (JR), 2010 WL 1767193 at *3 (D.D.C. Feb. 18, 2010)). Because the FCC has yet to classify VoIP as one or the other, courts have been left to make their own interpretations. *See Lange*, 903 F.3d at 718.

Nevertheless, we need not wade into this debate because Congress included in the Telecom Act a tax savings provision, which we find to be applicable to the Class Members' business license tax ordinances at issue in this case. The Telecom Act's tax savings provision specifically provides: "[N]othing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede . . . any State or local law pertaining to taxation, except as provided in §§ 622 and 653(c) of the Communications Act of 1934 and § 602 of this Act."[11]  47 U.S.C. § 152 note (c)(2) (the Telecom Act of 1996, Public Law 104-104, § 601(c)(2), 110 Stat. 56, 143-44, *codified as* 47 U.S.C. § 152 note).[12]

By including this tax savings provision, Congress demonstrated its intent that the Telecom Act does not preempt state or local authorities from imposing and collecting taxes on providers subject to the Telecom Act. *See Dakota Systems, Inc. v. Viken*, 694 N.W.2d 23, 35

---

[11] None of the excepted provisions – (1) franchise fees under § 622, (2) reduced regulatory burdens for open video systems under § 653(c), or (3) preemption of local taxation with respect to direct-to-home services under § 602 – are at issue here.

[12] The fact that this provision was included as a statutory note to § 601(c)(2) of the Telecom Act of 1996 does not limit its legal force or applicability. The laws of the United States are evidenced by the Statutes at Large, not by their placement within the United States Code, and § 152 note is part of the Telecom Act of 1996. *See* 1 U.S.C. § 112; *see also Springs v. Stone*, 362 F.Supp.2d 686, 697 n.7 (E.D. Va. 2005).

(S.D. 2005); *see also* 47 U.S.C. § 152 note.  In *Dakota*, Verizon sought a refund of state taxes paid on its gross receipts for the telecommunications it provided its customers.  694 N.W.2d at 26-27.  Verizon claimed that § 253(a) of the Telecom Act preempt the collection of the taxes. *Dakota*, 694 N.W.2d at 26-27; 47 U.S.C. § 253(a).  Section 253, which is titled "Removal of [B]arriers to [E]ntry," grants the FCC the authority to preempt any state or local statute, regulation, or other legal requirement that prevents any entity from providing interstate or intrastate telecommunications service in that jurisdiction.  47 U.S.C. § 253(a).

The *Dakota* court rejected Verizon's preemption claim because § 152 note's tax saving provision rendered inapplicable § 253(a)'s specific preemption provision.  694 N.W.2d at 35. We find the *Dakota* court's holding in this regard to be significant and particularly instructive here, because Charter's preemption argument in this case relies *not on specific statutory preemption language* as Verizon did in *Dakota*, *but instead on judicial interpretations* giving preemptive effect to § 153(24)'s definition of information service.  *See Lange*, 903 F.3d at 718; *but see Mozilla Corporation v. Federal Communications Commission*, 940 F.3d 1, 79 (D.C. Cir. 2019) ("[s]ection 153 . . . [contains] definitional provision[s] . . . and so is not an independent source of regulatory authority") (citation and internal quotations omitted).

We conclude, therefore, that the Class Members' business license tax ordinances are local laws "pertaining to taxation," are covered by 47 U.S.C. § 152 note's tax savings provision, and are not preempted by the Telecom Act.[13]  Point I is denied.

---

[13] *See City of Sunset Hills v. Southwestern Bell Mobile Systems, Inc.*, 14 S.W.3d 54, 56-58 (Mo. App. E.D. 1999) (holding a business license fee was not inconsistent with the Telecom Act and the Telecom Act did not preempt the city's ordinance establishing that fee).

15

**3.      The Cable Act of 1984 Does Not Preempt the Class Members' Business License Tax Ordinances**

In Point II, Charter argues that the Cable Act of 1984 expressly preempts the Class Members' business license tax ordinances at issue here based on the Cable Act's language that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority" that "is inconsistent with" the Cable Act is preempted and superseded.  *See* 47 U.S.C. § 556(c).  We disagree because the Cable Act's safe harbor provision, 47 U.S.C. § 542(g)(2), renders the foregoing preemption provision inapplicable to state or local taxes of general applicability, such as the business license taxes here, which apply to all suppliers of telephone service, both wireless and wire-line alike, and irrespective of whether the telephone service supplier is a cable operator or not.  *See id*.; *City of Eugene, Oregon v. Federal Communications Commission*, 998 F.3d 701, 714 (6th Cir. 2021).  Thus, these taxes are not unduly discriminatory against Charter in that they are not imposed on Charter "solely because of its status" as a cable operator.  *See Eugene*, 998 F.3d at 712-14; *see also* 47 U.S.C. § 542(g)(2); 47 U.S.C. § 542(g)(1).

**a.      The Cable Act**

In 1984, Congress enacted the Cable Act, 47 U.S.C. § 521 et seq., as an amendment to the Communications Act of 1934, to establish a national framework for regulating cable television.  *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 309 (1993); *see also American Civil Liberties Union v. F.C.C.*, 823 F.2d 1554, 1559 (D.C. Cir. 1987) ("[a]lthough both the FCC and local governments asserted regulatory authority over cable television, the breadth of their respective powers was ill-defined").

Through the Cable Act, Congress sought to relieve the cable industry of unnecessary and burdensome regulation to ensure that cable systems remain responsive to the needs of the public.  *American Civil Liberties Union*, 823 F.2d at 1559.  The Cable Act grants state and local

16

jurisdictions – called local franchising authorities – the authority to grant franchises to cable operators to construct and operate cable systems over the jurisdiction's public rights-of-way. *See* 47 U.S.C. § 522(10); 47 U.S.C. § 541(a)(2); s*ee also Beach Communications*, 508 U.S. at 309-10. Generally, cable operators must obtain a franchise before offering cable service in a jurisdiction. *See* 47 U.S.C. § 541(b)(1). Moreover, local franchising authorities may charge cable operators an annual franchise fee of up to five percent of gross revenues derived from cable services. *See* 47 U.S.C. § 542(b); *see also* 47 U.S.C. § 522(10); *Liberty Cablevision of Puerto Rico, Inc. v. Municipality of Caguas*, 417 F.3d 216, 219 (1st Cir. 2005). The Cable Act defines a "franchise fee" as "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such . . .." 47 U.S.C. § 542(g)(1).

### b. The Cable Act's Safe Harbor Provision

The safe harbor provision, which is the key to our resolution of this point, is nested in the Cable Act's foregoing provision dealing with franchise fees. *See* 47 U.S.C. § 542(g). After defining and authorizing franchise fees, the Cable Act also authorizes "any tax, fee, or assessment" on cable operators *so long as* the tax, fee, or assessment is of "general applicability" and "is [not] unduly discriminatory against cable operators." *See* 47 U.S.C. § 542(g)(2)(A) (emphasis added). Thus, such taxes, fees, or assessments are specifically excluded from the definition of a franchise fee and are allowed by the Cable Act. *Id.*

This is known as the safe harbor provision in that § 542(g)(2)(A) creates a safe harbor from the Cable Act's preemption provision, § 556(c), for state or local taxes of general applicability that do not unduly discriminate against cable operators and from the five-percent maximum franchise fee. *See* 47 U.S.C. § 542(g)(2)(A); *see also* 47 U.S.C § 556(c); 47 U.S.C. § 542(b). By way of example, a general sales tax is a tax of general applicability within the safe

harbor provision because it does not unduly discriminate against cable operators but applies to all companies. *Liberty Cablevision*, 417 F.3d at 223.

The record here demonstrates that the Class Members' business license taxes are all taxes of "general applicability" and are not unduly discriminatory against Charter based on its status as a cable operator. The ordinances impose business license taxes on any entity providing telephone service to customers in each jurisdiction. They do not single out Charter by imposing on it, for instance, a right-of-way fee, other preconditions *specific* to the granting of cable franchises, or a second set of regulatory fees on top of the cable franchise fee. *See id.*; *cf. Eugene*, 998 F.3d at 712-16 (discussed in detail below). Rather, they apply to all suppliers of telephone service, whether they are cable operators or not. Therefore, the Class's business license tax ordinances are not preempted by the Cable Act but, instead, are lodged firmly in the Act's safe harbor provision.

### c. *City of Eugene v. Federal Communications Commission*

For its preemption argument, Charter relies on the Sixth Circuit case of *City of Eugene v. Federal Communications Commission*, 998 F.3d 701. In *Eugene*, the city imposed a seven-percent fee on the gross revenues generated by providers of "telecommunications services" over the city's rights-of-way. *Id.* at 712. The city code's definition of "telecommunication activities" subject to the fee included three different kinds of services that were defined by the federal Communications Act: cable services, telecommunications services, and information services. *Id.*; 47 U.S.C. § 153(24), (53). The FCC concluded the city's seven-percent fee (1) was effectively a franchise fee that violated § 542(b)'s five-percent cap on franchise fees, and (2) violated § 541(b) in that it amounted to the regulation of a cable operator's provision of

18

information services. *Eugene*, 998 F.3d at 712; 84 Fed. Reg. 44,725-01 (Aug. 27, 2019) (hereinafter "Third Order");[14] *see also* 47 U.S.C. § 542(b); 47 U.S.C. § 541(b).

The Sixth Circuit rejected the FCC's first conclusion but sustained its second. *Eugene*, 998 F.3d at 712-16. The court rejected the claim that the city's fee on providers' gross revenues from telecommunications services was a disguised franchise fee subject to § 542(b)'s five-percent cap. *Eugene*, 998 F.3d at 712-714. Instead, the court found that the fee was improper under § 544(b)(1) because it was a "condition for a cable franchise" to operate which violated the Cable Act and triggered federal preemption. *Eugene*, 998 F.3d at 714-15. And though we draw certain lessons from *Eugene* for our analysis here, we find it unhelpful to Charter's position.

The *Eugene* court noted that the test for preemption under §§ 544(a) and 556(c) of the Cable Act is whether state or local action is "inconsistent with" a specific provision of the Act. *Eugene*, 998 F.3d at 711. The court then proceeded to whether the fee the city imposed on a cable operator's "broadband services," was a franchise fee under § 542(g)(1) in that it applied to cable operators "solely because of their status as such." *Eugene*, 998 F.3d at 712-14. After citing the FCC's declaration in its Third Order ¶ 88 that "Congress was well aware that 'cable systems' would be used to carry a variety of cable and non-cable services," the court keyed on the city's fee on "broadband services," as opposed to "cable services," before concluding that: "[T]he [c]ity['s] fee on broadband services, by definition, is not imposed based on the operator's provision of cable services. The fee is therefore not imposed 'solely because' of a cable operator's 'status as such[.]' Hence the fee is not a 'franchise fee' under § 542(g)(1)[,]" and therefore, the collection of the fee is not preempted by the Cable Act. *Eugene*, 998 F.3d at 713-14.

---

[14] The FCC's order, known as its Third Order, not only adjudicated the enforceability of the city's fee, but was a continuation of the FCC's effort to "set forth rules by which state and local governments may regulate cable providers." *Eugene*, 998 F.3d at 705.

19

This holding is critical to our rejection here of Charter's preemption argument because it recognizes that the safe harbor provision in § 542(g)(1) is an antidote to preemption so long as the tax or fee provision is not imposed on a cable company because it is a cable company.

Here, the Class Members' business license taxes are not imposed on Charter "solely because of its status" as a cable operator, nor are they imposed for use of rights-of-way or as any other precondition to its business as a cable franchise. The business license taxes here are non-discriminatory in that they are directed to "every firm, person or corporation now or hereafter engaged in the business of supplying or furnishing telephone or telephone service . . .." *See e.g.*, Winchester Municipal Code § 615.150. We fail to find any support in the record that the Class Members' ordinances in question subjected Charter to discriminatory treatment as a cable franchise that would constitute improper regulation. The Class here merely exercised its ability to collect taxes from businesses generally which is not inconsistent with any provision of the Cable Act. *See* 47 U.S.C. § 542(g)(2)(A); 47 U.S.C. § 544(a); 47 U.S.C. § 556(c); *also Eugene*, 998 F.3d at 711, 713-14.

The *Eugene* court then turned its focus to the FCC's finding of preemption under a different section, § 544(a) & (b). *Eugene*, 998 F.3d at 714-16. Section 544(a) provides that a "franchising authority may not regulate the *services*, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter." *Eugene*, 998 F.3d at 717 (emphasis in original) (quoting 47 U.S.C. § 544(a)). The court also noted that § 544(b)(1) prohibits franchising authorities from establishing "requirements for video programming or other information services." *Eugene*, 998 F.3d at 715 (quoting 47 U.S.C. § 544(b)(1)). And since "information services" under § 544(b)(1) includes "broadband services," which the city sought to tax, the court concluded that "[the] [c]ity . . . therefore could not, consistent with § 544(b)(1), impose on a cable operator a seven-percent broadband fee as a condition for a cable franchise."

20

*Eugene*, 998 F.3d at 715. In making this holding, the *Eugene* court noted the city's seven-percent fee on the cable operator's revenues from broadband services "[wa]s merely the exercise of its franchise power by another name . . . [a]nd § 544(b)(1) expressly barred the [c]ity from exercising its franchise power to that end." *Eugene*, 998 F.3d at 715; *see also Liberty Cablevision*, 417 F.3d at 221 (holding that "the municipalities' attempts to assess fees for use of these same rights-of-way are inconsistent with the Cable Act and are necessarily preempted").

We conclude that *Eugene*'s preemption holding analysis is unhelpful to Charter here because the ordinance at issue in *Eugene* is substantially different from the ordinances here. Unlike the ordinances here, the ordinance in *Eugene* specifically defined "telecommunication activities" subject to its fee to include cable services, telecommunications services, and information services. *See Eugene*, 998 F.3d at 712. Also absent here is the specific fee Eugene sought to impose on the cable company's "broadband services" which services are specifically defined in 47 U.S.C. § 544(b)(1) of the Cable Act as an "information service." *See Eugene*, 998 F.3d at 715; *see also* 47 U.S.C. § 544(b)(1). These distinctions undermine Charter's reliance on *Eugene*.

Here, all of the ordinances limit their application to Charter's provision of telephone service. And the *Eugene* court specifically stated it was not addressing whether a state or local government (as opposed to a franchising authority) may impose a fee on telecommunication services provided by cable operators. *Eugene*, 998 F.3d at 712 n.2.[15]

So, while the FCC in *Eugene* demonstrated that the fee on broadband services was just an additional franchise fee on the cable company by another name, *see id*. at 715, Charter has failed to demonstrate the same with regard to the ordinances here which impose license taxes on any

---

[15] "The question whether a fee of that sort would circumvent Title VI's limits on franchisor regulation of a cable operator's telecommunications services is neither fully briefed nor clearly presented on the facts here."

entity providing telephone service. The trial court concluded and we agree that the business license taxes imposed by the Class Members' ordinances are taxes of general applicability that fit within the Cable Act's safe harbor provision, § 542(g)(2)(A), because the taxes do not unduly discriminate against cable operators like Charter in that they do not impose a tax on Charter "solely because of its status" as a cable operator. *See id*.; *see also* 47 U.S.C. § 542(g)(1). Point II is denied.

**B.      Charter's Point III Arguing the Trial Court Erred in Finding that Charter Fiberlink was a "Telephone Company" Providing "Telephone Service" Subject to the Class Members' Business License Taxes Has No Merit**

In Point III, Charter argues the trial court erred in finding that Charter Fiberlink was a "telephone company" providing "telephone service" subject to the Class Members' business license taxes because the relevant tax-enabling statutes and the ordinances at issue in this case failed to define the terms "telephone company," "telephone," or "telephone service" to specifically include VoIP-enabled telephone service.[16] We disagree and hold the trial court correctly found that pursuant to Missouri's license-tax-enabling statutes, §§ 94.110, 94.270, 94.360, and 66.300,[17] Charter Fiberlink was a "telephone company" that provided "telephone service" taxable at the local level.

We focus, like the parties, on two Missouri license tax-enabling statutes – § 71.610 and § 94.270. Section 71.610, which addresses the power of all cities and towns to impose license taxes, provides: "No municipal corporation in this state shall have the power to impose a license tax upon any business, avocation, pursuit or calling, unless such business, avocation, pursuit or

---

[16] This point pertains to Charter Fiberlink only.

[17] In its order granting Rule 52.08(b)(3) class certification with subclasses, the trial court referenced three license-tax-enabling Missouri statutes, § 94.110 (third-class cities), § 94.270 (fourth-class cities), and § 94.360 (special charter cities). St. Louis County subsequently joined the class. As discussed in detail in Section IV of this opinion, § 66.300 is the license-tax-enabling Missouri statute for St. Louis County. These sections authorize the Class Members to impose a business license tax on certain businesses and occupations listed in the statutes.

calling is specially named as taxable in the charter of such municipal corporation, or unless such power be conferred by statute."  Section 94.270 then grants to fourth-class cities (like class representative Winchester) the power to license, tax, and regulate certain businesses and occupations which the statute then lists at length.  § 94.270.1.  The list includes "telephone companies" and "telegraph companies."  *Id*.  The issue then is whether the Class Members' ordinances' designations of "telephone," "telephone service," or "exchange telephone service" comply with these statutory provisions so as to authorize the jurisdictions' license taxes on Charter's telephone business.

The record demonstrates that pursuant to §94.270 and the other similar license-tax-enabling statutes referred to in footnote 17 of this opinion, jurisdictions, including those included in the Class here, routinely levy license or occupation taxes on businesses that supply telephone service in their jurisdictions and calculate the amount each business owes as a percentage of gross receipts.  Nevertheless, Charter claims the Class Members lack the authority to impose such a tax on Charter Fiberlink because § 94.270 does not define "telephone compan[y]" to include a cable provider that also provides telephone service over its broadband cable system using VoIP technology, and because Winchester's ordinance does not define "telephone service" to include one that employs VoIP technology.  We are unpersuaded.

Our rejection of Charter's semantical argument is well-supported by Missouri law.  For a business or occupation to satisfy § 71.610's requirement that it be "specially named" in order for a city to impose a license tax on that business or occupation, "it is sufficient if it 'clearly comes within the definition and meaning of the enumerated subjects or is in fact a *genus* of one of the named occupations.'"  *City of Sunset Hills v. Southwestern Bell Mobile Systems, Inc*., 14 S.W.3d 54, 59 (Mo. App. E.D. 1999) ((emphasis added) (quoting *Armco Steel v. City of Kansas City,*

23

*Mo.*, 883 S.W.2d 3, 6 (Mo. banc 1994) (quoting *City of St. Charles v. St. Charles Gas Co.*, 185 S.W.2d 797, 798 (Mo. 1945)).

In *City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595 (8th Cir. 2008), the issue was whether Cingular's business of providing cell phone services came within the city tax on businesses "supplying telephones, and telecommunications and telephonic service, and telecommunications services, within the city." *Id*. at 597. The court concluded that it did, reasoning that although the city's code did not define those operative terms, the plain and ordinary meaning demonstrated the ordinance's intention to cover all telephonic services, regardless of the type of technology used to provide the services. *Id*. at 606, 607. The court observed that the terms cell phone and telephone are commonly used interchangeably, and both types of devices receive and reconvert sound waves into signals that can be transmitted to remote locations. *Id*. at 607, 609.

It is not necessary for a statute to anticipate all technologies, such as VoIP, that may arise in the future. *See Kay-Decker*, 857 N.W.2d at 223 ("a statute can encompass technologies not in existence at the time of its promulgation"). To require such exactitude and foresight would defeat the purpose of generally phrased laws. *See AT&T Communications of Mountain States, Inc. v. State, Dep't. of Revenue*, 778 P.2d 677, 681-82 (Colo. banc 1989). The Missouri legislature and the Class Members here should not be required to update their laws every time a new form of technology is introduced by telephone companies. *See City of Jefferson City*, 531 F.3d at 608.

The record abounds in support of the trial court's conclusion that Charter is a telephone company providing telephone service, albeit through the use of VoIP technology, which readily satisfies both the tax-enabling statutes at issue here and the Class Members' ordinances' imposition of business license taxes on telephone service. The trial court justifiably relied on

24

Charter's representations both to the court and to the consuming public in its advertising that: "just like traditional wire line services, Charter Phone works through regular telephone jacks and phones, and provides access to 911 emergency services and directory listings"; Charter "offers its customers regular telephone service that happens to be provided using a different technology"; "Charter considers its service functionally equivalent to that provided by traditional wire-line service providers"; and "VoIP is simply the transmission of voice using Internet Protocol."

Additionally, to the Public Service Commission, Charter identified Fiberlink as a "telephone company" and "a competitive facilities-based provider of telephone services." Indeed, Charter did not register Fiberlink with the PSC as a VoIP provider pursuant to § 392.550. Instead, Charter registered as a competitive local exchange carrier.

Again, this record and the foregoing authorities demonstrate that Charter Fiberlink was a telephone company within the meaning of the tax-enabling statutes at issue here and that Charter's claim, based on those statutes' failure to define "telephone company" to include one that employs VoIP technology, is without merit. For the same reasons, we reject Charter's claim that the Class Members' ordinances' failure to define "telephone service" to include VoIP-enabled telephone service precludes the jurisdictions from taxing that service.[18]

---

[18] Finally, we are unpersuaded by Charter's reliance on a definitional provision in Missouri's Public Service Commission Law, § 386.010, et seq., in which VoIP is excluded from the definition of "telecommunications service." First, Charter fails to demonstrate how this PSC regulatory definition is even applicable or relevant to the tax-enabling statutes' employment of "telephone company" or the ordinances' use of the term "telephone service." Moreover, Charter, which did not register Charter Fiberlink as a VoIP provider with the PSC, now asks us to harvest a definition from the PSC's enabling statute and graft it to the tax-enabling statutes. Finally, we note that other Missouri statutory definitions of telecommunications service do not exclude VoIP. *See e.g.*, § 144.010.1(16) RSMo Supp. 2019.

Therefore, the trial court correctly found that pursuant to Missouri's license-tax-enabling statutes, §§ 94.110, 94.270, 94.360, and 66.300, Charter Fiberlink was a "telephone company" that provided "telephone service" taxable at the local level. Point III is denied.

**C.    Charter's Point V Arguing the Trial Court Erred by Failing to Give Individualized Treatment and Effect to Each Class Member's Ordinance Language Has No Merit**

In Point V, Charter contends the trial court erred by failing to give individualized treatment and effect to each Class Member's ordinance language given the differences among the various ordinances. Charter primarily contends the trial court erred in calculating back taxes owed based on "all revenue generated" by Charter on its telephone business in each jurisdiction. Charter claims the court erred in this regard because it ignored whether the revenue was generated by calls that were intrastate, interstate, local, or long distance and, further, that the various ordinances' use of terms like "telecommunications," "telephone service," and "exchange telephone service," should have triggered an individualized analysis by the trial court of each Class Member's ordinance to determine whether the call activity was taxable. We disagree because (1) the trial court gave meaning to the language used in each Class Member's ordinance; and (2) Charter's primary argument has no merit under Missouri law including the Missouri Supreme Court's decision in *City of Aurora v. Spectra Communications Group, LLC*, 592 S.W.3d 764. Additionally, (3) to the extent Charter raises other arguments in this point, they have no merit based on *Aurora* and the record in this case.

**1.    The Trial Court Gave Meaning to the Language Used in Each Class Member's Ordinance**

Charter's claim that the court failed to give meaning to the language used in each Class Member's ordinance is belied by the record. The voluminous record here demonstrates a Herculean effort on the part of the trial court. Frankly, this case was a class action in name only. Given the trial court's obvious familiarity with the contents of each city's individual ordinance,

26

the court essentially treated the case as an ordinary civil case with 124 individual plaintiffs. Its creation of the five subclasses outlined above shows this; but the court did not stop there. Among the nearly 150 pages of findings, conclusions, orders, and judgments the trial court issued here, we find numerous references to the specific contents of individual Class member ordinances which the trial court gave individualized attention and treatment when necessary.

2. **Charter's Primary Argument has No Merit Under Missouri Law Including the Missouri Supreme Court's Decision in *Aurora*, 592 S.W.3d 764**

The essential underpinning of Charter's argument is geographic. Throughout this case, Charter has primarily argued its tax liability should be limited to revenue generated solely within each individual jurisdiction. This argument has no merit.

A license tax on gross receipts is a tax on persons or entities for the privilege of doing business in the jurisdiction. *Kansas City v. Graybar Elec. Co., Inc.*, 485 S.W.2d 38, 40, 41 (Mo. banc 1972). "Gross receipts are merely a means to calculate the license tax; what is being taxed is the privilege of doing business in [the jurisdiction]." *Id*. at 41. And a municipality may impose a license tax "on business conducted within the city limits, although a portion of the business is carried on or the transaction is factually completed outside such municipality . . .." *Id*. at 42 (citation omitted); *see also Food Center of St. Louis v. Village of Warson Woods*, 277 S.W.2d 573, 578-79 (Mo. 1955) (plaintiff's liability for the privilege of doing business as a merchant in the city "was not affected by the fact that the gross sales on which the tax was measured were concluded outside the boundary line of [the city]").[19] Based on this well-

---

[19] We note that neither *Kansas City v. Graybar Elec. Co., Inc.*, 485 S.W.2d at 40, 41, nor *Food Center of St. Louis v. Village of Warson Woods*, 277 S.W.2d at 578-79, "addressed gross receipts in the context of whether they were derived from services within the city." *See Aurora*, 592 S.W.3d at 795.

established Missouri law, Class Members need not limit Charter's tax liability to revenue generated solely within each individual jurisdiction.

Moreover, Charter's argument that its tax liability should be limited to revenue generated solely within each individual jurisdiction has been rejected by the Missouri Supreme Court in *Aurora*, 592 S.W.3d 764.[20]  As explained in detail below, the trial court decision in this case is fully consistent with *Aurora*, which addressed this issue and determined that despite certain language differences among ordinances, business license taxes should generally be calculated upon "all revenue" generated by the licensee's telephone business within the jurisdiction unless the ordinance includes a specific exclusion or geographic limitation that would disallow business license taxes on a particular type or class of business activity.  *Id*. at 783-86, 795-97.

In *Aurora*, a group of cities filed an action for declaratory judgment and injunctive relief against CenturyLink and its subsidiaries for their failure to pay the license taxes on their telephone business which the cities claimed were due under their respective ordinances.  *Id.* at 771.  In its judgment, the trial court declared the ordinances' license taxes applicable to *all revenue* unless the ordinance specifically excluded certain type(s) of telephone call revenue.  *Id.* at 773.

The Missouri Supreme Court accepted transfer.  The Supreme Court considered and rejected CenturyLink's claim that some of the key terms employed in the various cities' ordinances were terms of art in the telecommunications industry with specific technical meanings and that the trial court should have honored and applied those while construing each ordinance and in determining whether CenturyLink's customer's calls fit within each such meaning.  *Id*. at 784-85.  The Court was unpersuaded that the ordinances' use of terms such as

---

[20] Our reliance on *Aurora* has company in this case.  While *Aurora* was pending before the Missouri Supreme Court, Charter filed a motion to stay this case because "[n]early every issue currently before [the *Winchester*] court is at issue in *Aurora*."

"telephone service" and "exchange telephone service" required such call-by-call analysis to determine whether CenturyLink's business activity in each jurisdiction was taxable under the ordinances. *Id*. Moreover, the Supreme Court agreed with the trial court's view that these terms identified broadly the type of business, i.e., telephone business, in which CenturyLink was engaged in each jurisdiction. *Id*. Therefore, the Court held that unless an ordinance specifically excluded a category of calls such as intrastate, interstate, local, or long distance, CenturyLink's back taxes were to be calculated on "all revenue" generated in each jurisdiction. *Id*. at 783-86, 795-97.

Here, the trial court did the same while specifically citing to *Aurora*, when it awarded "back-taxes based on 'all revenue' generated in each jurisdiction (*Aurora*, 592 S.W.3d at 771, 783-85, 801) – whether alleged to be intrastate or interstate, local or long distance – in the absence of an express exclusion (see Wentzville) (*Aurora*, at 773, 797)[.]"[21]

Thus, *Aurora* is on point here, and we find the trial court's determination that the Class Members in this case are generally entitled to back taxes on all revenue generated by Charter's telephone business in each jurisdiction, whether the calls were alleged to be intrastate, interstate, local, or long distance, fully conforms with *Aurora*. *See id*. at 783-86, 795-97; *see also Sprint Spectrum, L.P. v. City of Eugene*, 35 P.3d 327, 327-29 (Or. App. 2001) (city's telecommunications tax on wireless services "does not tax individual transactions . . . [but] is based instead on the provider's 'gross revenues derived from its telecommunication activities within the city'") (emphasis omitted) (rejecting carriers' argument that the city effectively taxes telephone calls made to locations outside the city limits).

---

[21] The trial court there individually analyzed the City of Wentzville's ordinance and determined that it specifically excluded long distance revenue from taxable "gross receipts."

29

**3.** **To the Extent Charter Raises Other Arguments in this Point, They Have No Merit Based on *Aurora* and the Record in This Case**

We now address other arguments Charter raises in Point V. Charter first contends the trial court erred when it rejected Charter's expert's testimony that the ordinances' terms like "telecommunications," "telephone," and "exchange telephone" should be given technical meanings as terms of art in the telecommunications industry; instead, the trial court gave these terms their plain and ordinary meaning since they were not defined in the ordinances.

Because the Supreme Court rejected the same assertion made by CenturyLink in *Aurora*, we are unpersuaded by Charter's argument on appeal and we agree with the trial court's approach in this case. 592 S.W.3d at 784-85. The trial court was entitled to disbelieve and not accept Charter's expert's testimony because "[a] trier of fact is free to believe any, all, or none of a witness's testimony." *See Aurora*, 592 S.W.3d at 786 (internal quotations and citation omitted). Additionally, because the ordinances before us did not define the operative terms at issue, the trial court properly gave them their plain and ordinary meaning to refer to any business that supplied telephone service in the jurisdiction. *See Aurora*, 592 S.W.3d at 784 (the interpretation of an ordinance is a matter of law that an appellate court reviews *de novo*); *Tupper v. City of St. Louis*, 468 S.W.3d 360, 371 (Mo. banc 2015) (holding the same rules governing statutory interpretation apply when interpreting an ordinance and absent a definition provided in the ordinance, "[an appellate] [c]ourt will ascertain and give effect to the intent of the enacting legislative body as reflected in the plain and ordinary meaning of the ordinance's language") (internal quotations and citation omitted).

Charter also argues in Point V that the trial court erred in failing to apply exclusions it claims appear in certain jurisdictions' ordinances (i.e., Ironton, Ballwin, Clayton, Eureka, Arnold

30

and Columbia), which should have reduced their tax base.[22] We are unpersuaded because Charter failed to carry its burden with respect to these matters. It is the taxpayer's burden to establish exemptions by clear and unequivocal proof. *Bartlett International, Inc. v. Director of Revenue*, 487 S.W.3d 470, 472 (Mo. banc 2016). To carry its burden, Charter was required to identify either the amounts or the documents evidencing the amounts it claims should have been excluded from the tax base. Because Charter failed to identify any discrepancy in the amount owed or include any documentation that would warrant a different finding by this Court, we find that its burden to establish its position by clear and unequivocal proof was not met.[23]

Finally, inasmuch as Charter's Point V indirectly challenges the damages calculation in terms of what revenue streams should have been included, we observe that the foundational damages model used by the trial court to determine not only the categories of Charter's revenue that were taxable under each jurisdiction's ordinance, but also the amounts due, was submitted to the court by Charter and was substantially based on Charter's data as to each Class Member.

### 4. Conclusion as to Point V

Based on the foregoing, Point V is denied.

### D. Charter's Point VI Arguing that the Trial Court Did Not Have the Authority to Hear this Case and It Should Have Been Adjudicated in Municipal Court Has No Merit

In Point VI, Charter argues that since this case pertains to municipal tax ordinance violations, the trial court lacked the authority to hear the case and it should have been heard in

---

[22] We note that from our review of the record, the trial court in its December 2020 final judgment considered and rectified certain miscalculations with regard to five of these jurisdictions.

[23] We acknowledge our Court's recent decision in *City of Columbia v. Spectra Communications Group, LLC*, 652 S.W.3d 356 (Mo. App. E.D. 2022), which construed the same ordinance from the City of Columbia that was at issue in this case. Given the distinct posture of these cases, one decided on summary judgment and the other tried to the court, our opinions are consistent given our conclusion here that Charter failed to carry its burden of proof with regard to the exclusions in the Columbia ordinance it claims the trial court overlooked.

municipal court. We disagree because as a court of general jurisdiction, the trial court had the authority to hear and decide the Class Members' claims for declaratory and equitable relief.

Section 527.020 of the Declaratory Judgment Act states that "[a]ny person . . . whose rights, status or other legal relations are affected by a . . . municipal ordinance . . . may have determined any question of construction or validity arising under the . . . ordinance . . . and obtain a declaration of rights, status or other legal relations thereunder." *See also* Missouri Supreme Court Rule 87.02(a) (effective from January 1, 1981 to the present). Moreover, a municipal corporation, such as some of the Class Members in this case, is a "person" under the statute. *City of Jackson v. Heritage Sav. & Loan Ass'n*, 639 S.W.2d 142, 143 (Mo. App. E.D. 1982).

"The [Declaratory Judgment Act] furnishes a particularly appropriate method for the determination of controversies relative to the construction and validity of statutes and ordinances." *City of Camdenton v. Sho-Me Power Corp.*, 237 S.W.2d 94, 95-96 (Mo. 1951) (citation omitted) (electric company's rights to own and operate electrical distribution system in the city properly adjudicated under the Declaratory Judgment Act in the circuit court); *see also City of St. Robert, Missouri v. Clark*, 471 S.W.3d 321, 329 (Mo. App. S.D. 2015); § 527.020. Moreover, suits that seek the collection of unpaid municipal license taxes are cognizable in circuit courts. *See City of St. Charles v. Union Elec. Co. of Mo.*, 185 S.W.2d 297, 299-304 (Mo. App. 1945). Accordingly, the trial court's authority to entertain and adjudicate the Class Members' first count for declaratory relief in connection with the applicability of their license tax ordinances to a certain portion of Charter's revenues is well-supported by Missouri law.

The Class Members' second count, an equitable claim for injunctive relief and for an accounting of Charter's tax obligations, was likewise fully within the authority of the trial court to adjudicate. It is well-established in Missouri that circuit courts have the authority to render

32

judgments in "*all* cases and matters, civil and criminal." *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 253 (Mo. banc 2009) (emphasis in original) (quoting Mo. Const. art. V, § 14); *see also Schweich v. Nixon*, 408 S.W.3d 769, 774 n.5 (Mo. banc 2013). This includes, of course, claims for equitable relief, like the Class Members' second count here. *See First Nat. Bank of Kansas City v. Mercantile Bank & Trust Co.*, 376 S.W.2d 164, 168 (Mo. banc 1964).

Because the Class Member's claims for declaratory and injunctive relief were properly brought in and adjudicated by the trial court, Point VI is denied.

## IV. CHARTER'S POINT IV RELATING TO ST. LOUIS COUNTY ONLY

The final point for our consideration is Charter's Point IV, which argues the trial court should have dismissed St. Louis County from the case because Missouri's tax-enabling statute, § 66.300,[24] only grants first-class counties the power to tax "exchange telephone service" and St. Louis County is no longer a first-class county by virtue of the 1995 amendment to Art. VI, § 18(a) of the Missouri Constitution. Charter argues the 1995 amendment should have retroactively repealed St. Louis County's license tax Ordinance 5,214, that was enacted in 1969 pursuant to tax-enabling statute § 66.300.

We disagree with Charter's arguments for two reasons. First, St. Louis County *was* a first-class county when it enacted in 1969 its ordinance pursuant to § 66.300 imposing a license tax on telephone service providers operating in St. Louis County. Second, we find that the 1995

---

[24] As enacted in 1967, § 66.300 provided:

> The county council or other legislative authority of any first class county having a charter form of government is hereby authorized to impose a license tax whereby every public utility engaged in the business of supplying or furnishing . . . exchange telephone service in the part of the county outside incorporated cities shall pay to the county, as a license or occupational tax, an amount not in excess of five percent of the gross receipts derived from such business within the unincorporated areas of the county.

*See* § 66.300 (RSMo 1967).

amendment to Art. VI, § 18(a) of the Missouri Constitution, which removed counties, like St. Louis County, with a charter form of government from the four-class system set forth in Mo. Const. Art. VI, § 8, was not intended to apply retroactively to repeal St. Louis County Ordinance 5,214.

Section 66.300, the tax-enabling statute before us, allowed any first-class county with a charter form of government to impose a license tax on exchange telephone services. On October 23, 1969, St. Louis County enacted Ordinance 5,214, which implemented its license tax authorized by § 66.300. In 1991, senate bill 34 amended numerous statutes applicable to counties including one change to § 66.300. 1991 Mo. Legis. Serv. S.B. 34, 86th General Assembly (First Regular Session). It replaced the phrase "first class county having a charter form of government" with "first class county having a population of over six hundred thousand inhabitants." *Id.* The amendments to § 66.300 did not specifically repeal any ordinances, so St. Louis County's Ordinance 5,214 was unaffected. When Ordinance 5,214 was enacted, St. Louis County was a first-class county with a charter form of government and with a population over six hundred thousand.

We now turn to Charter's argument that the 1995 amendment to Mo. Const. Art. VI, § 18(a) operated retroactively to repeal Ordinance 5,214. "In general, constitutional provisions are subject to the same rules of construction as other laws, except that constitutional provisions are given a broader construction due to their more permanent character." *Neske v. City of St. Louis*, 218 S.W.3d 417, 421 (Mo. banc 2007) (overruled on other grounds). An appellate court is required to give due regard to the main objectives of a constitutional provision at issue, as viewed in harmony with all related provisions. *Id.* Generally, a law is "construed to operate prospectively, unless legislative intent that [it] be given retrospective or retroactive operation is

34

expressed by the language of the act, or arises by necessary or unavoidable implication." *Utilicorp United, Inc. v. Director of Revenue*, 785 S.W.2d 277, 278 (Mo. banc 1990).

Again, the 1995 amendment to Art. VI, § 18(a) of the Missouri Constitution, removed counties, like St. Louis County, with a charter form of government from the four-class system set forth in Mo. Const. Art. VI, § 8. The intent of the 1995 constitutional amendment, as expressed by the legislature's joint resolution regarding the amendment and in the language that appeared on the ballot itself, is that "[t]here would be no direct fiscal impact" and "[t]he proposal is designed to maintain existing laws."[25] *See Savannah R-III School Dist. v. Public School Retirement System of Mo.*, 950 S.W.2d 854, 859 (Mo. banc 1997) ("[a] constitutional provision is interpreted according to the intent of the voters who adopted it").

Moreover, there are numerous examples after the 1995 constitutional amendment in which St. Louis County and other charter counties continue to be recognized as "first-class counties" in the context of the continued validity and applicability of certain statutes. In *Leiser v. City of Wildwood*, 59 S.W.3d 597 (Mo. App. E.D. 2001), Wildwood argued that a statute enacted in 2000 did not apply to the plaintiff's real estate because, after the 1995 amendment, St. Louis County was no longer "a county of the first classification having a charter form of government" pursuant to that statute. *Id*. at 603. Our Court disagreed and held that the statute continued to apply to St. Louis County despite the General Assembly's inclusion of the words "of the first classification" and that those words should be excised. *Id*. at 603-04; *see also City of Moline Acres v. Brennan*, 470 S.W.3d 367, 371 (Mo. banc 2015) (St. Louis County is a first-class county with a population of over 900,000 under § 546.902); *State ex rel. Zimmerman v. Blanc*, 548 S.W.3d 396, 398, 402 (Mo. App. W.D. 2018) (applying § 138.135.2 to St. Louis

---

[25] Official Ballot State of Missouri, Constitutional Amendment No. 1, 88th General Assembly (First Regular Session).

35

County as a "county of the first classification with a population of at least nine hundred thousand inhabitants"); *State v. Baldwin*, 484 S.W.3d 894, 896-900 (Mo. App. W.D. 2016) and *State v. Boyd*, 999 S.W.2d 276, 278 (Mo. App. E.D. 1999) (collectively holding that Jackson County and St. Louis County are first-class counties under § 70.820.5).

Furthermore, to accept Charter's retroactive repeal argument would likely wreak havoc with respect to numerous constitutional and statutory provisions that still reference and include former first-class counties that are now charter counties.[26]

We conclude that the 1995 amendment to Mo Const. art. VI, § 18(a) was not intended to be applied retroactively to effect a repeal of St. Louis County's long-standing business license tax Ordinance 5,214 that was duly authorized by § 66.300. Point IV is denied.

## CONCLUSION

For the reasons set forth above, we find in favor of all Class Members on Points I, II, III, V, and VI, we find in favor of St. Louis County on Point IV, and therefore, we affirm the judgment of the trial court.

_____
James M. Dowd, Judge

Michael E. Gardner, C.J., and
Lisa P. Page, J., concur.

---

[26] *See* Mo. Const. Art. X, § 11(b) (limiting property tax levy of first-class counties); Mo. Const. Art. VI, § 25 (allowing first-class counties to establish death and retirement plans; there is no statute for retirement plans in charter counties); § 67.500 (providing the county sales tax act excludes first-class counties adjoining a city not within a county)